

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-2003

# Williams v. Morton

Precedential or Non-Precedential: Precedential

Docket No. 02-3653

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Williams v. Morton" (2003). *2003 Decisions.* Paper 236.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/236

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed September 9, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3653

JAMES WILLIAMS;
ISHMON STALLWORTH,
*Appellants*

v.

WILLIS E. MORTON; J. BLACKSTONE;
F. JONES; ROY L. HENDRICKS;
WALTER WISE; FRANK GRAVES

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 98-cv-04310)
District Judge: Hon. Garrett E. Brown, Jr.

Argued June 26, 2003

Before: SLOVITER, AMBRO, *Circuit Judges*, and
TUCKER,* *District Judge*

(Filed: September 9, 2003)

Christopher J. Michie
John Bellwoar (Argued)
Dechert, Price & Rhoads
Princeton, N.J. 08543
Attorneys for Appellants

* Hon. Petrese B. Tucker, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

David Samson
  Attorney General of New Jersey
David M. Ragonese (Argued)
  Deputy Attorney General of
  New Jersey
Patrick DeAlmeida
  Deputy Attorney General of
  New Jersey
Trenton, N.J. 08625

      Attorneys for Appellees

## OPINION OF THE COURT

SLOVITER, *Circuit Judge.*

Before us is the appeal by prisoners from the order of the District Court granting summary judgment to prison officials and employees as to the prisoners' claims that their constitutional rights to the free exercise of religion and equal protection have been violated by the prison's failure to provide them with meals they contend are required by their religious beliefs. We further consider whether the District Court abused its discretion by admitting the declaration and deposition testimony of a witness into the summary judgment record.

## I.

### BACKGROUND

Plaintiffs Ishmon Stallworth and James Williams ("Prisoners"), inmates at the New Jersey State Prison ("NJSP"), filed suit against Willis E. Morton, Roy Hendricks, Walter Wise, and Frank Graves ("Prison Officials"), all of whom are either former or current NJSP officials, in the United States District Court for the District of New Jersey pursuant to 42 U.S.C. § 1983. The crux of Prisoners' claims is that the Prison Officials violated their constitutional rights by failing to provide them with Halal meat meals in conformity with their religious beliefs. A Halal, or lawful,

diet includes fruits, vegetables, seafood, and meat from herbivorous animals such as cows and chickens that are properly slaughtered. The opposite of Halal food is Haram food, which is prohibited or unlawful and includes pork and meat from carnivorous animals. Halal foods can become contaminated if they are commingled with Haram items.

Currently, the different diets provided by the NJSP fall into four general categories: (1) a regular meal which is served to approximately 600 inmates; (2) a series of health-related diets with low sodium, low cholesterol, and reduced calories which are served to about 350 inmates; (3) a Kosher diet that is provided to 4 Jewish inmates; and (4) a religious vegetarian diet served to approximately 225 inmates who cannot eat the regular prison diet for religious reasons.[1] The regulation creating the religious vegetarian meal reads:

> An inmate who cannot eat the food served to the general population because of the inmate's religious beliefs may request a religious vegetarian diet. Upon review and approval of the request by the Chaplain of the correctional facility in accordance with this subchapter, nutritionally balanced vegetarian meals shall be provided to the inmate in place of the food served to the general population.

N.J.A.C. § 10A:17-5.9

On behalf of themselves and other Muslim inmates, Prisoners contend that, as applied, this regulation violates their sincerely held religious belief that they are required to consume Halal meat in their diet. Their complaint alleges that the Prison Officials violated their rights under the Free Exercise Clause of the First Amendment[2] by not providing them with Halal meat and the Equal Protection Clause of

---

1. The description of the various diets offered at NJSP comes from the deposition testimony of Lorenza Graves, the prison's food service supervisor.

2. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." U.S. Const. amend. I.

the Fourteenth Amendment[3] by providing Kosher meals with meat to Jewish prisoners without providing Halal meat to Muslim inmates. They further claim that the Prison Officials violated their rights under the New Jersey Constitution and the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq.* Prisoners requested an injunction that would require the NJSP to include Halal meat in their diet and damages for the alleged violations of their constitutional rights.[4]

Analyzing Prisoners' constitutional claims under the four-part test enunciated by the Supreme Court in *Turner v. Safley*, 482 U.S. 78 (1987), the District Court granted the Prison Officials' motion for summary judgment.[5] Prisoners timely appealed.

## II.

## DISCUSSION

### A. Jurisdiction and Standard of Review

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's decision to grant summary judgment. *DeHart v. Horn*, 227 F.3d 47, 50 (3d Cir. 2000) (en banc). Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.* We must view all evidence and draw

---

3. The Fourteenth Amendment reads in relevant part: "[N]or shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

4. In their appellate brief, Prisoners refine their request as seeking "to compel NJSP to include Halal meat in at least some of the Halal meals provided Muslim prisoners." Br. of Appellants at 8.

5. It should be noted that the District Court denied the Prison Officials' summary judgment motion as to Prisoners' claims that their First Amendment rights were violated by several past instances of contamination of their current vegetarian diet. However, Prisoners dismissed this claim in order to expedite their appeal of the claims denied by the District Court. Accordingly, this issue is not before us.

all inferences therefrom in the light most favorable to the nonmoving party, here Prisoners. *Id.*

## B. Free Exercise Claim

As to their free exercise claim, Prisoners concede that the District Court applied the correct test as enunciated in *Turner* but argue that it incorrectly applied that test to the facts in the record. According to Prisoners, there is sufficient evidence creating a genuine issue of material fact as to whether the *Turner* factors weigh in favor of the Prison Officials, thereby making summary judgment inappropriate.

In *Turner*, the Supreme Court considered the proper standard under which courts are to review prison regulations that are challenged on constitutional grounds. The Court considered two somewhat competing principles, the first of which is that federal courts "must take cognizance of the valid constitutional claims" of inmates. *Turner*, 482 U.S. at 84. This judicial cognizance notwithstanding, courts must remember that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id.* (citation omitted). Bearing these dual principles in mind, the Court concluded that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.

Thereafter, the *Turner* Court provided the following four factors to consider when applying its newly enunciated reasonableness standard:

> First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it. . . . A second factor relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates. . . . A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. . . . Finally, the absence of ready

alternatives is evidence of the reasonableness of a prison regulation.

*Id.* at 89-90.

Furthermore, the burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it. *Overton v. Bazzetta*, 123 S. Ct. 2162 (2003) (applying *Turner* and upholding prison regulations limiting prisoner visitation rights).

We have held that a prerequisite to the application of *Turner* is the assertion of "only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *DeHart*, 227 F.3d at 51. The Constitution does not protect "mere assertion[s] of . . . religious beliefs." *Id.* The Prison Officials argue that it is also a prerequisite for the inmate to establish that the challenged prison policy "substantially burdens" his or her religious beliefs. Br. of Defendants at 24. There is no support for that assertion. Because the Prison Officials fail to provide us with any reason to doubt that Prisoners sincerely believe that Islam requires them to eat Halal meat, it follows that we must determine whether the prison's practice of not providing Halal meat meals is reasonable under *Turner*.

## 1. Legitimate Penological Interests

The District Court held that NJSP's decision to provide a vegetarian meal, rather than one with Halal meat, is rationally related to legitimate penological interests, namely simplified food service, prison security, and budgetary constraints. According to the District Court, if the prison were required to provide Halal meat, prison officials would have to coordinate a new program for food service that would require more kitchen help and could potentially cause problems between prisoners. It further found "no evidence of record" showing that Halal meat could be provided to the more than 200 inmates who currently receive the religious diet in a cost efficient manner or within the prison's budget. App. at 21.

Prisoners do not dispute that simplified food service, security, and budget constraints are legitimate penological

interests. Indeed, our prior decisions preclude such an argument. *See Fraise v. Terhune*, 283 F.3d 506, 517-18 (3d Cir. 2002) (finding security to be a legitimate penological interest); *DeHart*, 227 F.3d at 53 (finding simplified food service to be a legitimate penological interest). Instead, Prisoners contend that the evidence raises an issue of fact for the jury regarding whether these interests would be adversely affected by the addition of Halal meat meals.

With respect to simplified food service, Prisoners argue that the District Court overlooked the testimony of Lorenza Graves. They point to Graves' statement that it "would be no great problem" to serve Halal meat received from an outside vendor to the inmates who now receive vegetarian meals or to serve Halal meat to the general prison population if it came from the distribution center in place of non-Halal meat. App. at 140, 145. Prisoners further argue that the testimony of various NJSP officials does not support the Prison Officials' contention that providing Halal meals with meat would raise security concerns.

Finally, Prisoners claim that the District Court misapplied the summary judgment standard as to budgetary concerns, arguing that they have submitted sufficient evidence to show that the NJSP could provide Halal meat in a cost-efficient manner. Pointing to evidence that a Halal meal with meat would cost about $1.80 more per meal than the cost of a regular meal, they argue that the prison spends $3,650 a year per individual to meet its four Jewish prisoners' dietary needs but will not spend $280 a year per individual to meet its 225 Muslim prisoners' needs.

According to Prisoners, based on the above evidence, there is at least an issue of material fact as to whether the policy of denying Halal meals with meat is rationally related to a legitimate penological interest. We disagree.

We have no reason to doubt that the District Court carefully considered all of the evidence in the record. It noted that Howard Beyer, former Assistant Commissioner for Operations of the New Jersey Department of Corrections, testified that due to the large Muslim population at NJSP, the addition of Halal meals with meat

would cause a considerable disruption to the prison's daily operation. Beyer further testified that the prison does not experience similar disruptions by providing Kosher meals because they provide so few of them. According to Beyer, each Halal meat meal would have to pass through an X-ray machine, one at a time, which would be prohibitively time consuming. Furthermore, as with all things entering the prison, Beyer noted that the Halal meat meals would create additional security concerns.

As to budgetary concerns, Prisoners concede that providing a Halal meal with meat would cost more per prisoner than the vegetarian meal. Furthermore, according to Graves, the vegetarian meals and other special diets cost approximately the same for each prisoner. Graves explained that to stay within the budget, he and other administrators must control "what [they] prepare, cook and serve." App. at 149.

Although Prisoners have pointed to issues of fact in the record regarding these matters, they are not *material* issues of fact under the applicable legal standard. As noted above, Prisoners have the burden of disproving the validity of the regulation. It is not enough to show there are different views as to the relevant issues and underlying facts. Based on the record evidence, we agree with the District Court that providing vegetarian meals, rather than Halal meals with meat, is rationally related to the legitimate penological interests in simplified food service, security, and staying within the prison's budget.

In so concluding, we keep in mind the substantial deference we owe to prison administrators who bear a "significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton*, 123 S. Ct. at 2167. Furthermore, this court has noted that when a challenged regulation implicates security, as it does here, judicial deference is "especially appropriate." *Fraise*, 283 F.3d at 516 (affirming district court's grant of summary judgment to prison officials against claims that policy allowing officials to designate "security threat groups" and transfer members of group to special unit violated

prisoners' free exercise, equal protection, and due process rights).

## 2. Alternative Means of Expressing Religious Belief

The next *Turner* factor requires us to determine if the prison has provided inmates with alternative avenues through which they can express their religious beliefs. Where a prison affords the inmate alternative means of expressing his or her religious beliefs, that fact tends to support the conclusion that the regulation — here providing a vegetarian meal rather than one with meat — is reasonable. *DeHart*, 227 F.3d at 57.

The District Court concluded that Muslim prisoners have various ways in which to practice their religion. In addition to the pork-free, vegetarian diet, the Court pointed to a weekly congregational prayer service known as the Jumu'ah, the opportunity to study Arabic and to observe Ramadan by providing a special meal enabling Muslims to comply with the holiday's fasting requirement, the opportunity to pray five times during each day, and the chance to observe the five pillars of the Islam faith. The Court further noted that the NJSP accommodates prisoners who celebrate Eid, another Muslim holiday, by allowing them to cook their own meals containing Halal meat.

Prisoners concede they have "some alternative means" of practicing their religion, pointing out the existence of an onsite Imam, the ability to observe religious Holidays, and the weekly prayer service. Instead, they argue that these accommodations cannot be attributed to the NJSP. The District Court rejected these arguments, noting that Prisoners were unable to provide another instance, aside from the lack of Halal meat meals, in which their religious expression was not being accommodated. We agree.

Based on the record and Prisoners' own admissions, it is undisputed that the prison provides Muslim inmates with the opportunity to pray daily, attend special weekly services, and observe religious holidays. Thus, the second *Turner* factor weighs in favor of the Prison Officials.

## 3. Impact of Accommodation on Guards and Other Inmates

Under the third *Turner* factor, we focus on the specific religious practice at issue to determine how accommodating

the inmate would impact guards and other inmates. The District Court concluded that it would be difficult for prison administrators and security personnel to accommodate by changing the religious vegetarian meal policy. In response to Prisoners' argument that administrative concerns would dissipate if Halal meat meals were provided to the entire prison population, rather than just Muslims, the Court found that Prisoners failed to present evidence showing the feasibility of providing the meals to the general population. Furthermore, it believed that such an act could be viewed as imposing Islam on the whole prison community. The District Court also pointed to security and budgetary concerns that importing 200 Halal meals would create.

Prisoners argue that the evidence provides a factual issue as to whether the provision of Halal meat meals would affect security, prison administration, or the budget. They rely on their arguments as to the first *Turner* factor, which we have already rejected. They further point out that in his deposition Scott Faunce, the Deputy Commissioner of the New Jersey Department of Corrections, testified that most of the food that comes into NJSP is not scanned. According to Prisoners, if unscanned food comes into the prison without security problems, there is no reason why the NJSP would have to scan Halal meals. Prisoners overlook or ignore Faunce's qualifying statement that while much of the food is not scanned, it is searched. It would be unreasonable for us to conclude that the need to search, rather than scan, hundreds of additional Halal meat meals could not produce security concerns and administrative burdens. The Supreme Court's admonition that we should defer to administrative decisions of prison officials is applicable here.

Prisoners also argue that this case is analogous to our decision in *DeHart*, where we considered claims by an inmate that prison officials had violated his free exercise and equal protection rights by not providing him with a vegetarian diet consistent with his Buddhist beliefs. In that case, we reversed the district court's summary judgment to the prison defendants and remanded so that the district court could more fully develop the record as to the consequences of accommodating the inmate for guards,

other inmates, and the allocation of prison resources. 227 F.3d at 59-60.

In *DeHart*, we concluded that the first and second *Turner* factors weighed in favor of the defendants, noting that denying the inmate's request for a religious vegetarian diet "bears some rational relation" to the penological interests in a simplified food service and in avoiding jealousy among inmates, *id.* at 53, and that the inmate had alternative means of expressing his religious beliefs, *id.* at 57. However, we found the third and fourth factors to be less clear. The crux of our problem with the district court's reasoning as to these factors was its conclusion that the third *Turner* factor proved "neutral" in the face of "no undisputed evidence" concerning the impact of accommodation. *Id.* at 57-58. In such circumstances, we concluded that *Turner* requires a "more thorough analysis of the reasonableness" of the prison regulation when imposed on the plaintiff's religion. *Id.* at 59. We noted that there was already a process in the prison for serving individually prepared therapeutic meals and that the plaintiff had made a prima facie showing that this process could accommodate his religious needs by adding a cup of soy milk. *Id.* at 59.

Prisoners argue that the same reasoning applies in the case at hand. They contend that because there is an existing administrative process under which the Prison Officials can accommodate their desire for Halal meat meals, whatever slight burden the prison must bear is minimal in comparison to that entailed by providing Kosher meals to the Jewish inmates.

Prisoners' arguments are unpersuasive as this case is decisively different from *DeHart*. There are at least two significant distinctions. First, the *DeHart* plaintiff requested only a cup of soy milk to be added to food already purchased by the prison. *Id.* at 57. Here, Prisoners request full Halal meals with meat. Second, the plaintiff in *DeHart* was one person. Here, Prisoners are bringing suit on behalf of more than 200 hundred Muslim prisoners.

The Prison Officials repeatedly return to this latter fact, arguing that the sheer number of prisoners who would be

receiving Halal meat meals would be overwhelming across the spectrum, creating administrative, budgetary, and security issues. They point not only to Beyer's testimony but also to that of Roy Hendricks, the Administrator of New Jersey State Prison, who stated:

> From my point of view you are talking about 200 meals, feeding three times a day, additional storage, freezer space for the meals. You are talking about additional officers to check the meals. You are also talking about a cost factor. So I think that's quite a bit. Normally, this institution feeds over 200 — about 200,000 meals a month, so it would be a problem.

App. at 176.

Contrary to Prisoners' contentions, the record provides us with sufficient evidence supporting the Prison Officials' argument that providing Halal meat meals to hundreds of prisoners would have a marked effect on the prison community. Thus, the third *Turner* factor is far from "neutral" but instead favors the Prison Officials.

### 4. The Absence of Ready Alternatives

As to the fourth and final *Turner* factor, we look to whether there is an absence of "ready alternatives" to the challenged prison regulation, as "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." 482 U.S. at 90. To be sure, this is not a "least restrictive test" in that prison officials do not "have to set up and shoot down every conceivable alternative method" of accommodation. *Id.* If an inmate can point to an alternative that would fully accommodate his or her rights at a "de minimis" cost, we can consider that as evidence that the challenged regulation is unreasonable. *Id.* at 90-91.

The District Court found that the prison could not fully accommodate Prisoners' request for Halal meat meals at a *de minimis* cost and therefore that the fourth *Turner* factor also favored the Prison Officials. As to this factor, Prisoners rely on their previous arguments that the record shows that the provision of the Halal meat meals would not create staffing, security, or budgetary problems. However, as

explained above, we fail to find such support in the record. Contrary to Prisoner's contention, there is sufficient evidence supporting the Prison Officials' argument and the District Court's conclusion that providing Halal meat meals cannot be provided at a de minimis cost.

We thus reject Prisoners' free exercise claim.

## C. Equal Protection Claim

We next consider Prisoners' claim that the failure to provide them with Halal meat while providing Kosher meals with meat to Jewish inmates violates their rights under the Equal Protection Clause of the Fourteenth Amendment. To prevail on an equal protection claim, a plaintiff must present evidence that s/he has been treated differently from persons who are similarly situated. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). *Turner* is equally applicable to Prisoners' equal protection claims. *See DeHart*, 227 F.3d at 61.

The District Court rejected Prisoners' equal protection claims, finding that they had provided no evidence that Jewish prisoners received meat in their Kosher meals. It noted that the record showed that all inmates in need of a religious diet are provided vegetarian meals.

Prisoners argue that in reaching its conclusion, the District Court "had to ignore or misconstrue" the evidence. Br. of Prisoners at 49. For support, they point to a statement from Graves' 1999 certification in which he says, "[i]nmates that require Kosher meals for religious reasons do receive meals that contain meat." App. at 160. However, they fail to acknowledge that during Graves' deposition in 2001, he explicitly retracted that statement:

> I oversighted on the meals, the type of meal . . . Jewish prepared meat. There is no meat. I oversighted on that. There is no meat. These are meatless meals being prepared by the Jewish BT Management. The company supplies the kosher meals. It's meatless.

App. at 128.

Graves' corrective statement corroborates the testimony of others. Specifically, both Hendricks and Beyer testified

that the Kosher meals provided to Jewish prisoners do not contain meat.

The record is devoid of any evidence supporting Prisoners' contention that the Kosher meals contain meat. Because all religious meals at NJSP are vegetarian, we reject Prisoners' equal protection claim that the prison treats Jewish and Muslim prisoners in a "disparate and unequal" manner. Br. of Prisoners at 48.

## D.  Motion to Exclude Testimony of Scott Faunce

In their final claim, Prisoners argue that the District Court erred by denying their motion to exclude Faunce's testimony. We review a district court's admission of evidence or ruling on a discovery dispute for abuse of discretion. *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002).

Prisoners argue that the Prison Officials identified Faunce as a witness almost six months after the close of discovery by attaching Faunce's affidavit to their summary judgment reply brief. This, according to Prisoners, was especially egregious as they had made repeated efforts before the end of discovery to identify persons with knowledge related to their complaint. The District Court denied Prisoners' motion to exclude Faunce's testimony but allowed them to depose Faunce themselves and to amend their previously-filed summary judgment brief. Furthermore, the Prison Officials were ordered to pay Prisoners' costs and counsel fees in connection with the deposition.

Prisoners argue that the submission of Faunce's testimony violates Federal Rules of Civil Procedure 26 and 37. Under Fed. R. Civ. P. 26(e)(2), a party is required to supplement its discovery responses if it learns that its initial response is incomplete in a material way and the opposing party does not have the new information. Fed. R. Civ. P. 37(c)(1) provides that if a party without substantial justification fails to amend a prior discovery response, it may not use that evidence unless the failure is harmless.

Prisoners contend that the Prison Officials provided no justification for their failure to disclose Faunce and they argue that they suffered harm and prejudice because of the

Prison Officials' "complete disregard for their discovery obligations." Br. of Prisoners at 55-56. Also, they claim that the Prison Officials benefitted from reading Prisoners' brief on summary judgment which was prepared before Faunce's testimony was introduced. Lastly, Prisoners argue that Faunce gave an expert opinion and the Prison Officials should have identified him as an expert and provided a report.

The Prison Officials rebut any suggestion of bad faith by explaining Faunce was named Deputy Commissioner of the New Jersey Department of Corrections two days after they filed their summary judgment motion and after the close of discovery. Therefore, they could not have identified Faunce as an expert during discovery. They argue that Prisoners were not harmed by the admission of Faunce's testimony as they were permitted to depose Faunce, at the Prison Officials' expense, and were allowed to supplement the record with his deposition testimony and additional briefs.

We are persuaded by the Prison Officials' arguments and conclude that the District Court did not abuse its discretion in allowing Faunce's testimony. Prisoners were given adequate opportunity to depose Faunce and supplement the record themselves. In such a situation, we fail to see how Prisoners suffered harm from the admission of Faunce's testimony.

## III.

## CONCLUSION

For the foregoing reasons, we will affirm the District Court's grant of summary judgment to the Prison Officials.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*