# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMIN RAHMAN SHAKUR,
   *Plaintiff-Appellant,*

v.

DORA B. SCHRIRO, Director, sued
in her individual and official
capacity as Director of Arizona
Department of Corrections; MIKE
LINDERMAN, sued in his individual
and official capacity as Director
Pastoral Activities; BHISHM
NARAINE, sued in his individual
and official capacity as Assistant
Deputy Warden; M. ERROL GRANT,
Esq., Senior Chaplain,
   *Defendants-Appellees.*

No. 05-16705

D.C. No.
CV-01-02470-PGR

OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, District Judge, Presiding

Argued and Submitted
August 14, 2007—San Francisco, California

Filed January 23, 2008

Before: Diarmuid F. O'Scannlain, Michael Daly Hawkins,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge O'Scannlain

## COUNSEL

Derek L. Shaffer, Constitutional Law Center, Stanford Law School, Stanford, California, argued the cause for the appellant and was on the briefs; Kathleen M. Sullivan, Maaren A. Choski, David J. Strandness, and Rhett O. Millsaps, II, Constitutional Law Center, Stanford Law School, Stanford, California, were on the briefs.

Cathy Stewart, Arizona Attorney General's Office, Phoenix, Arizona, argued the cause for the appellees; Attorney General Terry Goodard, Darrin J. DeLange, and Kelley J. Morrissey, Arizona Attorney General's Office, Phoenix, Arizona, were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether prison officials violated the Religious Land Use and Institutionalized Persons Act, the Free Exercise Clause, and the Equal Protection Clause by denying

a Muslim inmate's request for a religious dietary accommodation.

I

Amin Rahman Shakur is an inmate of the Arizona Department of Corrections ("ADOC") at Florence, Arizona.[1] While incarcerated, Shakur changed his inmate religious preference designation from Catholic to Muslim. In due course, ADOC granted Shakur's request to adopt for religious reasons a lacto-vegetarian diet, which includes milk but not meat or eggs. Shakur currently receives an ovo-lacto vegetarian diet, which includes milk and eggs, but no meat.

Shakur has contended throughout the administrative grievance process and this litigation that the vegetarian diet causes him hardship because it "gives [him] gas" and "irritates [his] hiatal hernia." His primary issue with the diet is that his gastrointestinal discomfort interferes with the state of "purity and cleanliness" needed for Muslim prayer.

ADOC provides two kosher diets to Jewish inmates: a standard kosher diet and an Orthodox kosher diet. The standard kosher diet consists of two vegetarian meals and a TV-style dinner that contains meat; it costs about five dollars more per inmate per day than the regular prisoners' diet. The Orthodox kosher diet costs three to five times that amount per inmate. According to Shakur, kosher meat would be consistent with Islamic Halal requirements[2] and would provide him with an alternative protein source that would not cause any disruptive health problems.

---

[1]Shakur is in the custody of ADOC serving a 21-year sentence for burglary, two 21-year sentences for kidnapping, a 15-year sentence for theft and an 8-year sentence for escape.

[2]Halal meat is ritually slaughtered and prepared according to Islamic specifications. Muslims are instructed to eat meat only if it is Halal. Meat that is not Halal is referred to as Haram and is forbidden.

A

In January 2000, Shakur submitted a request for the standard kosher diet, which was denied.[3] Subsequently, in a letter dated February 18, 2000, and addressed to Michael Linderman, the Pastoral Administrator at the prison, Shakur requested a kosher meat diet, which he claimed was permitted under the Qur'an. In a March 8, 2000 letter, Linderman advised Shakur "that a Kosher diet is not a requirement of his religion" and pointed out that "the Department allows Muslim inmates the opportunity to request a vegetarian diet should they choose so as to avoid eating meat that is not Halal."

On March 21, 2000, Shakur filed an Inmate Grievance complaining that his request for a kosher diet had been denied. That grievance was referred to M. Errol Grant, the Senior Chaplain at the jail at the time. Grant responded that "[y]ou were given Chaplain Linderman's response. That has not changed." Shakur appealed Grant's response to Bhishm Naraine, an Associate Deputy Warden, but Naraine denied the appeal, stating that "the experts have given you an informed decision on which I rest my opinion." Finally, Shakur appealed to Terry Stewart, the Director of ADOC at the time, who denied the appeal, stating that Shakur had been advised appropriately.

---

[3]In February 2000, Shakur filed an overlapping Inmate Grievance raising other religious issues, including the lack of a religious exemption from ADOC's requirement that inmates remain clean shaven. Although Shakur had received a limited medical waiver from the shaving requirement several years earlier, the waiver did not permit him to grow a beard of more than a quarter inch in length. Shakur contends that the limited waiver conflicts with his religious faith, which requires that his beard remain unshaven. ADOC denied his grievance and his appeals, finding that a shaving waiver was not required for the practice of his religion.

B

Shakur filed a *pro se* civil rights complaint on December 18, 2001, and a first amended complaint on May 7, 2002.[4] On August 5, 2002, the district court dismissed the first amended complaint with leave to amend. Shakur filed a second amended complaint (hereinafter "the complaint") on September 4, 2002, which alleged in Count I the "[v]iolation of religious liberties under First Amendment [and] (any other applicable laws)." Count II alleged "[v]iolations of Fourteenth Amendment and any other applicable law." Shakur specifically noted in his filing that this count involved an Equal Protection claim in that it alleged "fail[ure] to afford the Plaintiff who is a Muslim the right it affords other religions, i.e. Jews . . . ."[5]

The district court issued a memorandum and order granting summary judgment to the defendants on all counts on August 10, 2005. As for Shakur's First Amendment Free Exercise claim, the district court found that, even assuming that kosher meat is not prohibited by Islam, Shakur did "not allege that consuming Halal meat is required of Muslims as a central tenet of Islam, nor d[id] he provide any evidence which would support that contention." Additionally, the district court determined that even if consuming Halal meat was a central tenet, the refusal to provide him with a Halal meat diet was rationally related to legitimate penological interests, namely, avoiding the additional cost and administrative burden. The district court did not address whether the provision of kosher meat meals to Jewish prisoners and denial of Halal meat

---

[4]Dora B. Schriro has replaced Terry Stewart as Director of ADOC. The other defendants named in the complaint who remain part of this case are Grant, Linderman and Naraine. They are referred herein collectively as "ADOC."

[5]In Count III, Shakur alleged a violation of his First Amendment rights in the denial of his request for a religious exemption for shaving "due to religious belief and practice."

meals to Muslim inmates violated the Establishment Clause. As for Shakur's claim under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), the district court concluded that his free exercise had not been substantially burdened and, even if it had been, ADOC had established that its dietary regulations furthered a compelling state interest and were the least restrictive means of achieving that interest.

The district court also granted summary judgment to ADOC on Shakur's Equal Protection claim "because the Equal Protection Clause does not require state prisons to provide each religious sect or group within a prison with identical treatment." The court concluded that because prisoners were not a protected class, ADOC only needed to show a rational basis for its regulations, which it had satisfied by showing the extensive costs of providing Halal meat to inmates, "especially given the fact that kosher meat is not Halal meat and Muslims are to avoid non-Halal meat."[6]

Shakur timely appealed.

## II

Shakur first argues that the district court erred in granting summary judgment to ADOC on his claim that denial of a kosher/Halal meat diet violated the Free Exercise Clause of the First Amendment. We review the district court's grant of summary judgment *de novo. Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001).

## A

[1] Prisoners "do not forfeit all constitutional protections by

---

[6]The district court did not address Shakur's shaving claim, ruling that "this claim was not stated in the second amended complaint" and was thus waived.

reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). Inmates retain the protections afforded by the First Amendment, "including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citing *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam)). However, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " *Id.* (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).

**[2]** "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Ward v. Walsh*, 1 F.3d 873, 876-77 (9th Cir. 1993) (holding that *Turner* still applies to free exercise claims of prisoners after *Employment Division, Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990)). *Turner* sets forth four factors to be balanced in determining whether a prison regulation is reasonably related to legitimate penological interests:

> (1) Whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it";
>
> (2) Whether there are "alternative means of exercising the right that remain open to prison inmates";
>
> (3) Whether "accommodation of the asserted constitutional right" will "impact . . . guards and other inmates, and on the allocation of prison resources generally"; and
>
> (4)   Whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives."

*Turner*, 482 U.S. at 89-90 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).

B

**[3]** As a preliminary matter, the parties dispute whether a prisoner must objectively show that a central tenet of his faith is burdened by a prison regulation to raise a viable claim under the Free Exercise Clause. The district court held that Shakur was obligated to show that ADOC had burdened "conduct mandated by his faith," citing *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997), and *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir. 1995). *See also Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987), *aff'd sub nom. Hernandez v. C.I.R.*, 490 U.S. 680 (1987) (holding that "the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine"). Shakur argues that it is the sincerity of his belief rather than its centrality to his faith that is relevant to the free exercise inquiry. *See Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (holding that to implicate the Free Exercise Clause, a belief must be both " 'sincerely held' " and " 'rooted in religious belief' ") (quoting *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)).

Although the Supreme Court's decision in *Hernandez* affirmed *Graham*, the Court was careful to note that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." 490 U.S. at 699. In *Employment Division v. Smith*, the Supreme Court reiterated that "[i]t is no more appropriate for judges to determine the 'centrality' of religious beliefs before applying a 'compelling interest' test in the free exercise field, than it would be for them to determine the 'importance' of ideas before applying the 'compelling interest' test in the free speech field." 494 U.S. at 886-87. Nevertheless, in *Freeman* and *Bryant*, which both followed *Hernandez* and *Smith*, we continued to adhere to the objective centrality test.

**[4]** Given the Supreme Court's disapproval of the centrality test, we are satisfied that the sincerity test set forth in *Malik* and *Callahan* determines whether the Free Exercise Clause applies. *Accord Levitan v. Ashcroft*, 281 F.3d 1313, 1319 (D.C. Cir. 2002) ("A requirement that a religious practice be mandatory to warrant First Amendment protection finds no support in the cases of the Supreme Court or of this court."); *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (en banc) ("[O]nly those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection."). Here the district court impermissibly focused on whether "consuming Halal meat is required of Muslims as a central tenet of Islam," rather than on whether Shakur sincerely believes eating kosher meat is consistent with his faith.

**[5]** Although Shakur conceded during the summary judgment proceedings that he is not *required* as a Muslim to eat Halal meat,[7] the district court failed to consider Shakur's claim that the gastrointestinal distress caused by the vegetarian diet substantially burdened his religious activities and required him to find an alternative protein source consistent with Islam. According to ADOC, "Shakur's issues with his vegetarian diet were not religious in nature" but were in fact "medical issues that he should have addressed to the [ADOC] medical staff." However, Shakur has consistently alleged adverse health effects from the vegetarian diet that interfered with his religious activities. As a result of these health issues, Shakur contends that he needs a meat-based protein source instead, and asserts that he sincerely believes that the kosher meat diet already provided to Jewish inmates would be consistent with his religious faith. Given his sincere belief that he is personally required to consume kosher meat to maintain his spirituality, we are satisfied, as a threshold matter, that the

---

[7]Shakur admitted in his statement of facts supporting his opposition to the summary judgment motion: "Plaintiff agrees with the defendant that a vegetarian diet would be an acceptable alternative for Muslims . . . ."

prison's refusal to provide a kosher meat diet implicates the Free Exercise Clause.

## C

[6] The district court held that ADOC's refusal to provide Shakur with a kosher diet satisfied the *Turner* test because it was rationally related to legitimate penological interests. The court did not actually balance the four *Turner* factors, noting instead that "several federal courts have concluded that a prison's refusal to provide prisoners with a Halal diet was rationally related to legitimate penological interests." (citing *Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003); *Hudson v. Maloney*, 326 F. Supp. 2d 206, 211 (D. Mass. 2004)). Given that summary judgment requires the absence of any genuine issue of material fact, the district court's cursory case citations are insufficient to support its holding. Hence, we must engage in a full *Turner* analysis to determine whether any genuine issue of material fact exists with respect to Shakur's free exercise claim.

## 1

[7] The first *Turner* factor requires us to determine whether there was a legitimate penological interest that is rationally related to the disputed regulation. 482 U.S. at 89. ADOC claims that its dietary policies were related to two legitimate penological interests: the reduction of administrative and budgetary burdens. Here Shakur concedes that these are legitimate penological interests but disputes whether these interests were rationally related to ADOC's denial of Shakur's dietary requests. According to Shakur, the fact that "an administrative apparatus" for providing kosher meals already exists undercuts any argument that serving him these meals would create administrative difficulties. Shakur also disputes the factual basis for ADOC's budgetary claims and emphasizes that accommodating "a single inmate" would not cost ADOC much money.

**[8]** Although the marginal cost and administrative burden of adding Shakur to the roster of kosher-diet inmates would be small or even negligible, we cannot conclude that no rational nexus exists between ADOC's dietary policies and its legitimate administrative and budgetary concerns. ADOC could rationally conclude that denying Muslim prisoners kosher meals would simplify its food service and reduce expenditures. Hence, the first *Turner* factor weighs slightly in favor of ADOC.

2

**[9]** Under the second *Turner* factor, we consider whether Shakur has "alternative means by which he can practice his religion" or is "denied all means of religious expression." *Ward*, 1 F.3d at 877. It is undisputed that Shakur had numerous other means of practicing his religion. For example, he could keep a copy of the Qur'an in his cell, along with a prayer rug and up to seven religious items (provided that they did not pose "a threat to the safe, secure and orderly operation of the institution"). He could receive visits from an imam upon request, and he could participate in the religious observance of Ramadan. While it is disputed whether Shakur could meaningfully engage in personal study and prayer in his cell as a result of his diet-induced medical issues, given the other accommodations provided by ADOC, he "retained the ability to participate in other significant rituals and ceremonies of [his] faith." *Id.* at 877; *see also O'Lone*, 482 U.S. at 352 (holding that the second *Turner* factor is satisfied if a prison allows prayer and discussion, access to an imam, and observance of Ramadan, even if inmates could not attend a weekly religious service); *Williams*, 343 F.3d at 219 (holding that the second *Turner* factor is satisfied if a prison allows daily prayer, attendance of special weekly services, and observance of religious holidays, even if inmates could eat vegetarian meals but not Halal meat). Consequently, the second *Turner* factor also weighs in ADOC's favor.

3

**[10]** Under the third prong of the *Turner* test, we consider the "impact [the] accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally." *Ward*, 1 F.3d at 878 (citing *Washington v. Harper*, 494 U.S. 210, 225 (1990)). ADOC argues that accommodating Shakur "could look like favoritism to other inmates and could lead to a hostile prison environment," and that "providing an inmate with such a diet could also lead inmates to request diets that their religions did not require, increasing [ADOC's] costs for meals by exorbitant amounts."

In *Ward*, we discounted the favoritism argument, since this effect "is present in every case that requires special accommodations for adherents to particular religious practices." *Id.* Moreover, while we acknowledged the potential for significant financial and administrative burden in accommodating the dietary requests of the inmate and all similarly situated inmates, we noted that "the district court made no findings regarding the financial impact of accommodation." *Id.* at 879. Although we gave "deference to the prison official's own assessment of the burden on prison operations," we refused to "accept the warden's assertion on appeal that the disruption would be significant" absent specific findings. *Id.* at 878-89.

Here ADOC, supported only by a Pastoral Administrator's affidavit, makes the conclusory assertion that providing all 850 of its Muslim prisoners with kosher meals would cost "an additional $1.5 million annually," and providing them with Halal meat would "be in the millions of dollars annually." There is no evidence in the record suggesting that ADOC actually looked into providing kosher meat to all Muslim prisoners, which could potentially result in economies of scale that would reduce the overall cost of the meals. Moreover, there is no indication that ADOC investigated suppliers of Halal meat, solicited bids or price quotes, or in any way studied the effect that accommodation would have on operating

expenses. Finally, there is no indication that other Muslim prisoners would demand kosher meals if Shakur's request were granted.

**[11]** Without more detailed findings in the record to support ADOC's assertions, we cannot determine whether ADOC would prevail on the third *Turner* factor. *Id.*; *see also Hunafa v. Murphy*, 907 F.2d 46, 48 (7th Cir. 1990) (Posner, J.) ("On this record, which consists essentially of a brief affidavit filed by the prison's food administrator that summarizes the prison's concerns but makes no attempt to estimate their magnitude in relation to the plaintiff's religious claims, the balance is too close for summary judgment to be proper.").

4

**[12]** Finally, the fourth *Turner* factor requires us to consider whether "there are ready alternatives to the prison's current policy that would accommodate [Shakur] at de minimis cost to the prison." *Ward*, 1 F.3d at 879. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90.

**[13]** Shakur argues that if ADOC cannot accommodate him with a Halal meat diet, it can simply provide him with the standard kosher meat diet already enjoyed by Jewish inmates. ADOC contends that procuring Halal meat would be difficult and prohibitively expensive, and that serving kosher meat to Muslim inmates would also be costly. Hence, ADOC maintains that there are no economically feasible alternatives to Shakur's current vegetarian diet. Again, the district court failed to make adequate findings of fact concerning the cost and availability of Halal meat. Furthermore, the fact that ADOC already provides Jewish inmates with kosher meals that cost $5 per day more than the standard meal, and orthodox kosher meals that cost three to five times more, "casts substantial doubt on [its] assertion that accommodating

[Shakur's] request would result in significant problems for the prison community." *DeHart*, 227 F.3d at 58; *see also Ashelman v. Wawrzaszek*, 111 F.3d 674, 678 (9th Cir. 1997) ("The evidence also shows that the prison accommodates the dietary requirements of other religious groups . . . without disruption. Under these circumstances, it does not appear that the difficulties envisioned by the prison are insurmountable.").

5

**[14]** Based on the record as it currently stands, we cannot determine whether the alternative kosher diet requested by Shakur places more than a de minimis burden on ADOC. Since the district court made insufficient findings with respect to the third and fourth *Turner* factors, the district court's grant of summary judgment on the free exercise claim must be vacated and the matter remanded to the district court so that it can fully develop the factual record in light of the *Turner* factors as to the impact of the accommodation and the availability of ready alternatives.

III

Shakur next argues that the district court erred in granting summary judgment to ADOC on his claim that denial of a Halal/kosher meat diet violated RLUIPA.

A

**[15]** Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling government interest" and is "the least restrictive means of furthering that . . . interest." RLUIPA § 3(a), 42 U.S.C. § 2000cc-1(a). RLUIPA, passed after the Supreme Court's decisions in *Employment Division v. Smith*,

494 U.S. 872 (1990), and *City of Boerne v. Flores*, 521 U.S. 507 (1997), mandates a stricter standard of review for prison regulations that burden the free exercise of religion than the reasonableness standard under *Turner. See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005). The Supreme Court upheld the constitutionality of RLUIPA in *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005), noting that "RLUIPA . . . protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."

## B

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A). We have noted that a burden is substantial under RLUIPA when the state " 'denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " *Warsoldier*, 418 F.3d at 995 (quoting *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981)).

The district court emphasized that ADOC has not substantially burdened Shakur's religious exercise because it does not "require Plaintiff to act in a way that violates his sincerely held religious beliefs, i.e., the policy does not require or encourage Plaintiff to eat non-Halal meat." While it is true that the vegetarian diet served by ADOC does not require plaintiff to eat Haram meat in violation of his beliefs, Shakur alleges that it exacerbates his hiatal hernia and causes excessive gas that interferes with the ritual purity required for his Islamic worship. ADOC contends that excessive gas simply does not constitute a substantial burden.

*Sefeldeen v. Alameida*, No. 05-15809, 2007 WL 1585599 (9th Cir. June 4, 2007), provides guidance as to whether

Shakur's medical complaints constituted a substantial burden on his free exercise. In *Sefeldeen*, we affirmed a grant of summary judgment against a Muslim inmate who claimed that the prison's failure to serve him a Halal meat diet violated the Free Exercise Clause and RLUIPA. Like Shakur, Sefeldeen was provided with a vegetarian meal that was consistent with Halal practices; however, unlike Shakur, "Petitioner's complaints to Appellees at the administrative level focused on the perceived nutritional adequacy of the vegetarian diet," and "Petitioner could point to no adverse physical effects directly resulting from the vegetarian meal plan." *Id.* at *2. While our decision in *Sefeldeen* is not precedential, it demonstrates that adverse health effects from a prison diet can be relevant to the substantial burden inquiry. However, the extent to which Shakur's gastrointestinal problems interfered with his religious activities is a factual issue for the district court to resolve.

Shakur also argues that ADOC's dietary policy constituted a substantial burden because it "put[ ] him to a Hobson's choice between options that are mutually unacceptable to his practice of his religious faith." Namely, he must choose among eating the vegetarian diet that is Halal but disruptive to his religious activities, eating the regular diet that is Haram and forbidden by his religion, or changing his religious designation to Jewish simply to obtain the desired kosher meat meals.

**[16]** In *Warsoldier*, we observed that a prison policy that "intentionally puts significant pressure on inmates . . . to abandon their religious beliefs . . . imposes a substantial burden on [the inmate's] religious practice." 418 F.3d at 996; *see also Sherbert v. Verner*, 374 U.S. 398, 404 (1963). The extent to which the prison's policies pressured Shakur to betray his religious beliefs is another factual dispute to be resolved by the district court.

## C

Once the plaintiff establishes that the challenged state action substantially burdens his religious exercise, the government bears the burden of establishing that the regulation serves a compelling government interest and is the least restrictive means of achieving that interest.

### 1

[17] In *Cutter*, 544 U.S. at 722, the Supreme Court acknowledged that "maintain[ing] good order, security and discipline, consistent with consideration of costs and limited resources," is a compelling government interest. The district court found that ADOC's refusal to serve Shakur kosher meat furthered a compelling state interest, *i.e.*, "avoiding the prohibitive expense of acquiring Halal meat for all Muslim inmates or providing these inmates with kosher meat," but the court did not consider any potential effect on maintaining order and discipline.

ADOC asserts that it would cost about $1.5 million annually to provide Halal or kosher meat to all 850 of its Muslim inmates. However, as Shakur points out, there is a factual dispute over ADOC's cost estimate, especially given that it was provided in an affidavit from ADOC's Pastoral Administrator rather than an official specializing in food service or procurement. Under Federal Rule of Civil Procedure 56(e)(1), an affidavit supporting summary judgment "must be made on personal knowledge, set forth such facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." It is doubtful whether an employee whose main functions are to "assist in hiring, training, and supervising the [ADOC] chaplains; secure and administer any contracts between [ADOC] and religious providers; and represent the ADOC in legal matters that are religious in nature" is competent to testify about the cost of procuring prison meals. Furthermore, Linderman's affidavit

states that his testimony is based not only "on [his] personal knowledge" but also on "consultation with [ADOC] staff, and research on the issues." As we have noted, "[c]onclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient." *Casey v. Lewis*, 4 F.3d 1516, 1527 (9th Cir. 1993). If his testimony "relied on information from (unsworn) departmental . . . officers, and the source of these officers' information is unclear," then it potentially relied on inadmissible hearsay evidence. *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001)

[18] We are troubled by the district court's reliance on this affidavit, especially because the government bears the burden of proving the existence of a compelling state interest. 42 U.S.C. § 2000cc-2(b). When the moving party also bears the burden of persuasion at trial, to prevail on summary judgment it must show that "the evidence is so powerful that no reasonable jury would be free to disbelieve it." 11-56 Moore's Federal Practice - Civil § 56.13 (citing *Edison v. Reliable Life Ins. Co.*, 664 F.2d 1130, 1131 (9th Cir. 1981)). Based on the record, which contains no competent evidence as to the additional cost of providing Halal or kosher meat to ADOC's Muslim prisoners, we cannot affirm the district court's grant of summary judgment.[8]

2

The district court also asserted that ADOC's religious diet regulations are "the least restrictive means" of furthering its interest in cost containment. The record indicates that ADOC

---

[8]It is also unclear from the record whether the $1.5 million figure provided by Linderman as the cost of providing all 850 Muslim inmates with kosher TV dinners "(850 Muslim inmates x $5.00 per day x 365 days per year)" accounts for whether these inmates are currently receiving regular meals, lacto vegetarian meals, or ovo-lacto vegetarian meals, which presumably have different costs. Further, as noted above at page 1025, ADOC has provided no evidence that all 850 Muslims would even request a kosher TV dinner were it made available to them.

refused Shakur's request for a kosher diet for the following reasons: he is not Jewish, Islam does not require Muslims to consume Halal meat as a central tenet, and his current diet is nutritionally adequate. However, ADOC did not appear to have actually considered creating an exemption for Shakur based on the adverse physical reaction caused by his vegetarian diet, which according to Shakur substantially burdened his religious activities.

In *Warsoldier*, 418 F.3d at 996, we admonished that a prison "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." Here the record contains only conclusory assertions that denying Shakur the kosher diet was the least restrictive means of furthering its interest in cost containment.

Moreover, Shakur points to a prison in Washington State that apparently serves a Halal meat diet to Muslim inmates that is "minimally more expensive than the standard diet" and "significantly less expensive than Kosher diets." *Bilal v. Lehman*, No. C04-2507, 2006 WL 3626808, at *7 (W.D. Wash. Dec. 8, 2006). As we noted in *Warsoldier*, "we have found comparisons between institutions analytically useful when considering whether the government is employing the least restrictive means. Indeed, the failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means." 418 F.3d at 1000.

[19] On this record, where there is factual dispute as to the extent of the burden on Shakur's religious activities, the extent of the burden that would be created by accommodating Shakur's request, and the existence of less restrictive alternatives, we cannot conclude that summary judgment on the

RLUIPA claim was appropriate. The RLUIPA claim must be remanded.

### IV

Shakur also contends that the district court erred in granting summary judgment to ADOC on his claim that ADOC violated the Fourteenth Amendment's Equal Protection Clause by providing only Jewish inmates with a kosher meat diet.

### A

The Equal Protection Clause requires the State to treat all similarly situated people equally. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Moreover, the Equal Protection Clause entitles each prisoner to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz*, 405 U.S. at 322.

The district court reasoned that because "prison inmates are not a 'protected class' for purposes of equal protection analysis," ADOC needed to show only a "rational basis for its disparate treatment of Jewish and Muslim inmates with regard to providing the Muslim inmates with Kosher meat." The court concluded that "the extensive cost of providing this product to Muslim inmates" supplied this rational basis, "especially given the fact that Kosher meat is not Halal meat and Muslims are to avoid non-Halal meat."

[20] We are persuaded that the district court erred in focusing on Shakur's status as a prisoner rather than his status as a Muslim. The district court thus applied the wrong standard of review, substituting mere rational basis review for the four-part balancing test required by *Turner*. Under the *Turner* test, Shakur can succeed only "if the difference between the defendants' treatment of him and their treatment of Jewish inmates is 'reasonably related to legitimate penological interests.'"

*DeHart,* 227 F.3d at 61 (quoting *Clark v. Groose*, 36 F.3d 770, 773 (8th Cir. 1994)).

### B

The only penological interest mentioned by the district court is "the extensive cost" of providing kosher meat to Muslim inmates. As discussed in Part II.C.3 *supra*, the record is not sufficiently developed to ascertain the precise weight that cost should be afforded in a *Turner* analysis. Furthermore, it is not at all clear that the prison's purported cost justification is even valid given the large expense it already undertakes to provide its Jewish inmates with costly kosher meals (and in some cases, even costlier orthodox kosher meals). Summary judgment on the Equal Protection claim was therefore inappropriate at this stage as well.[9] *See Hudson*, 326 F. Supp. 2d at 213-14 (denying prison's motion for summary judgment

---

[9]The district court's reliance on *Williams* is unavailing. In *Williams*, Muslim prisoners alleged that the prison treated them differently from Jewish prisoners by denying Muslims meat in their religious meals. 343 F.3d at 221. However, noting that "*all* religious meals at [the prison] are vegetarian," the court "reject[ed] Prisoners' equal protection claim that the prison treats Jewish and Muslim prisoners in a 'disparate and unequal manner.'" *Id.* at 222 (emphasis added). Since it is uncontroverted that ADOC serves specially prepared meat only to Jewish prisoners, *Williams* is inapposite.

ADOC also cites *Kahey v. Jones*, 836 F.2d 948 (5th Cir. 1988), for the proposition that prisons are not required to respond to inmates' particularized dietary requests. In *Kahey*, an inmate "averred that the Moslem religion prevents her not only from eating products containing pork, but from eating any food cooked or served in or on utensils that have come into contact with pork or any pork by-product." *Id.* at 949. She therefore requested "special food and individualized processing and containers in order to completely avoid pork-contamination." *Id.* at 949-50. The court affirmed summary judgment for the prison, holding that "prisons need not respond to particularized religious dietary requests." *Id.* at 950 (citing *Udey v. Kastner*, 805 F.2d 1218 (5th Cir. 1986)). In contrast to the inmate in *Kahey*, Shakur is not requesting any individualized processing or containers; he simply requests the same kosher TV-style dinner already served to many Jewish inmates.

because the pleadings failed to provide information necessary for a *Turner* analysis, including "material establishing in a competent way that no 'consistent and reliable' source of Halal meat is available to the Department, that the costs of providing meals with Halal meat would in fact be two or three times that of the existing standard and vegetarian menus, or any analysis of the comparative costs of providing Kosher and Halal meals").

## V

Finally, Shakur raises an Establishment Clause claim. While ADOC argues that Shakur failed to raise this argument in his complaint and the district court did not consider this claim in its opinion, Shakur argues that his second amended complaint fairly encompassed the Establishment Clause when it referred to "vio[lation] of religious liberties under the First Amendment" and "violation of the Fourteenth Amendment."

We have a "duty . . . to construe pro se pleadings liberally," especially when filed by prisoners. *Hamilton v. United States*, 67 F.3d 761, 764 (9th Cir. 1995) (citing *Hughes v. Rowe*, 449 U.S. 5, 9 (1980)). Construed broadly, the second amended complaint's reference to the First and Fourteenth Amendments could fairly include the First Amendment's Establishment Clause, incorporated against the States by the Due Process Clause of the Fourteenth Amendment.

[21] However, here Shakur failed to raise the Establishment Clause issue in his opposition to summary judgment, even though ADOC's motion lacked any reference to the issue.[10] We have previously held that a plaintiff has "abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment." *Jenkins v. Cty. of Riverside*,

---

[10]ADOC also argues that Shakur waived the issue by failing to raise it in his original opening brief. Since we authorized Shakur to file a replacement opening brief, this argument lacks merit.

398 F.3d 1093, 1095 n.4 (9th Cir. 2005). Therefore, despite our liberal construction of his pleadings, Shakur has failed to preserve this issue for appeal and the claim must be dismissed.[11]

## VI

In conclusion, the district court's summary disposition of Shakur's claims based on a sparse factual record warrants reversal. As *Ward* makes clear, only a careful analysis of a fully developed record can justify the burdening of an inmate's religious rights.[12]

**REVERSED and REMANDED.**

---

[11]The district court also held that Shakur had waived his claim that ADOC's failure to grant him a religious waiver from its shaving policy violated his First Amendment rights, since he did not raise it in his second amended complaint. However, we are satisfied that the third count of the second amended complaint adequately pleads the shaving claim. Moreover, unlike the Establishment Clause claim, ADOC addressed the shaving-related claim in its motion for summary judgment, and Shakur referred to the claim in his opposition to the motion. Although ADOC asserts that the shaving-related claim is moot, since he was granted a medical shaving waiver, the waiver permits growth of only 1/4 inch, whereas Shakur contends that his religious faith does not permit shaving at all. ADOC's mootness argument therefore fails, and the shaving-related claim must be remanded as well.

While Shakur's complaint charges only a violation of the First Amendment, and not of RLUIPA or any other law, ADOC itself appears to have read a RLUIPA claim into his complaint, given that both its summary judgment motion and answering brief on appeal argue that the shaving policy does not violate RLUIPA. Consequently, on remand the district court should consider whether ADOC's refusal to grant a religious shaving waiver violates both the First Amendment and RLUIPA.

[12]Shakur's *pro se* "Motion for Production of Transcript (Oral Argument); Motion to Compel," filed on December 31, 2007, is denied as moot.