Douglas L. Rayes, United States District Judge
Plaintiff Michael Wayne Sprouse, who is confined in the Arizona State Prison Complex-Florence, South Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against Arizona Department of Corrections (ADC) Director Charles L. Ryan and Wardens Greg Fizer and Lance Hetmer. (Docs. 1, 48.) Before the Court is Defendants' Motion for Summary Judgment, which Sprouse opposes. (Docs. 68, 71.)
The Court will grant the Motion in part and deny it in part.
I. Background
In his five-count Complaint, Sprouse, who is Jewish, alleged violations of his rights under the First Amendment Free Exercise Clause, the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc et seq., and the Fourteenth Amendment Equal Protection Clause. (Doc. 1.)
In Count I, Sprouse alleged that Ryan does not provide the daily caloric count of the kosher meals and that the kosher diet is nutritionally inadequate and violates his rights under the First Amendment and RLUIPA.
In Count II, Sprouse alleged it is his sincerely held religious belief that fruits and vegetables be washed and eaten whole, and ADC cuts and minces his vegetables thereby violating his rights under the First Amendment and RLUIPA.
In Count III, Sprouse claimed that Ryan and Hetmer prohibit Sprouse from growing out his beard in accordance with his religious beliefs in violation of the First Amendment and RLUIPA. Sprouse further claimed that Defendants have permitted a Muslim inmate to grow his beard-for religious reasons-beyond the length permitted under ADC policy, thereby violating Sprouse's right to equal protection.
In Count IV, Sprouse alleged that beef in a kosher diet is a necessary part of Passover, yet Ryan and Fizer eliminated beef from the kosher diet plan in violation of the First Amendment and RLUIPA.
And in Count V, Sprouse claimed that Ryan and Hetmer refuse to provide Sprouse disposable utensils in order to conform to his kosher dietary practices and they put Sprouse's kosher food on reusable trays that are used for regular meals, which violates his rights under the First Amendment and RLUIPA.
Defendants move for summary judgment on the grounds that (1) Sprouse's religious beliefs have not been substantially burdened, (2) Defendants did not act in a discriminatory manner toward Sprouse, and (3) Defendants are entitled to qualified immunity on the First Amendment claims. (Doc. 68.)[1]
*1353 II. Summary Judgment Standard
A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see also Celotex Corp. v. Catrett , 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. Celotex , 477 U.S. at 323, 106 S.Ct. 2548.
If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc. , 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; see Triton Energy Corp. v. Square D. Co. , 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v. Cities Serv. Co. , 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) ; however, it must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp. , 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal citation omitted); see Fed. R. Civ. P. 56(c)(1).
At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson , 477 U.S. at 249, 106 S.Ct. 2505. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. Id. at 255, 106 S.Ct. 2505 ; Soremekun v. Thrifty Payless, Inc. , 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).
III. Relevant Facts
A. Kosher Diet and Meal Service
In April 2007, ADC authorized Sprouse to receive the kosher diet pursuant to his declared religious preference and beliefs that require observance of kosher dietary restrictions. (Doc. 69, Defs.' Statement of Facts ¶¶ 3-4.)
ADC contracts with Trinity Services Groups, Inc. (Trinity), which provides food services to ADC inmates. (Id. ¶ 5.) Trinity's kosher diet meal plans are prepared by a dietician to meet the nutritional standards and guidelines established by the National Academy of Sciences-National Research Council. (Id. ¶ 7.) ADC pastoral staff and a volunteer Rabbi review and approve the menus after confirming that all the items listed meet kosher dietary standards. (Id. ) With the exception of eggs, fresh fruit and vegetables, and other items considered inherently kosher, only foods certified by a recognized Orthodox Kosher standard with symbols such as "OU" (Orthodox Union), "K" (Kosher), or "CRC" (Chicago Rabbinical Council) are served in the kosher meal plans. (Id. ¶ 8.) Some prepacked single service items such as sugar, cookies, and salad dressings are served in packets without a kosher symbol because they are delivered in bulk packaging that bears an appropriate kosher certification.
*1354 (Id. ) Also, cold cuts and cheeses served with the Kosher Passover Meal Plan are purchased from a vendor that pre-slices the items and then delivers them in bulk packaging that bears an appropriate kosher certification. (Id. ) The kosher TV-dinner style meals are purchased from a certified kosher purveyor and are certified as kosher. (Id. )
The kosher diet menu provides, in part, for 3/4 cup lettuce and cabbage, 1/2 cup of fresh vegetables, and one serving of fruit. (Id. ¶ 9.) The tools used to cut fruit and vegetables are designated as kosher-only tools and are cleaned and stored separately from other tools. (Id. ¶ 10.) The sink in which kosher-designated tools are cleaned is cleaned and sanitized and then used to wash only the kosher-designated tools, which are then stored separately from other tools. (Id. )
Defendants state that the kosher diet menu includes a kosher beef meal twice a week, and that this meal has always been on the menu. (Id. ¶ 11.) The kosher beef meal is not 100% beef; it contains some beef and is considered a beef-flavored entrée from the kosher manufacturer, and it satisfies the nutritional and kosher dietary standards. (Id. ¶ 13.)
Although the kosher diet meals used to be served on Styrofoam or cardboard disposable trays, in recent years, a volunteer Rabbi advised that disposable containers are not required to meet kosher standards and that ADC's cleaning process for the trays was sufficient for serving kosher meals. (Id. ¶ 15.) Defendants state that ADC instructed Trinity to wrap the kosher meals in cellophane before placing the meals on the trays and to wrap a layer of cellophane around the trays before placing the wrapped meals on the trays. (Id. ) Sprouse states that the trays are not wrapped; rather, the wrapped kosher meals are placed right onto the trays. (Doc. 71 at 14 & Ex. 26.)
B. Beard
In April 2007, ADC granted Sprouse a religious shaving waiver allowing him to maintain a beard up to 1/4 inch in length. (Id. ¶ 16.)
In February 2014, Sprouse initiated the prison's grievance system to complain that the 1/4-inch limit causes him to violate his sincerely held religious belief to maintain a longer beard and that another inmate who is Muslim was allowed to maintain a beard longer than 1/4 inch. (Id. ¶ 17.) Sprouse's requests to grow out his beard were denied by Hetmer and Ryan on the ground that ADC policy did not allow beards longer than 1/4 inch. (Id. ¶¶ 17-23.) In April 2014, Sprouse's final appeal was denied by Ryan on the ground that Sprouse failed to establish a religious reason for growing his beard longer than 1/4 inch. (Id. ¶ 24.)
In July 2015, ADC policy was modified to allow all inmates to maintain beards up to 1 inch in length. (Id. ¶¶ 26-27.)
IV. Kosher Diet and Meal Service
A. Legal Standards
1. First Amendment
"Inmates clearly retain protections afforded by the First Amendment ... including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz , 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citations omitted). Nevertheless, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Id. at 348, 107 S.Ct. 2400.
To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." Malik v. Brown , 16 F.3d 330, 333 (9th Cir. 1994) ;
*1355 see Shakur v. Schriro , 514 F.3d 878, 884-85 (9th Cir. 2008) (noting that the "sincerity test," not the "centrality test," applies to a free exercise analysis).
After the inmate makes this initial showing, he must show that prison officials substantially burden the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith. Hernandez v. C.I.R. , 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) ; Shakur , 514 F.3d at 884-85. "A substantial burden ... place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." Ohno v. Yasuma , 723 F.3d 984, 1011 (9th Cir. 2013) (quoting Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter , 456 F.3d 978, 988 (9th Cir. 2006) (internal quotation marks and alterations omitted) ).
A regulation that substantially burdens a prisoner's right to freely exercise his religion will be upheld only if it is reasonably related to a legitimate penological interest. Shakur , 514 F.3d at 884-85. In Turner v. Safley , the Supreme Court identified four factors that must be balanced in determining whether a prison regulation is reasonably related to a legitimate penological interest: (1) there must be a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact accommodation of the right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives. Shakur , 514 F.3d at 884 (citing Turner v. Safley , 482 U.S. 78, 89-90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ).
2. RLUIPA
RLUIPA was enacted to provide "very broad protection for religious liberty"; it "protects 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief[.]' " Holt v. Hobbs , --- U.S. ----, 135 S.Ct. 853, 859, 862, 190 L.Ed.2d 747 (2015) (quoting Burwell v. Hobby Lobby Stores, Inc. , 573 U.S. ----, ----, 134 S.Ct. 2751, 2760, 189 L.Ed.2d 675 (2014), and § 2000cc-5(7)(A) ); Warsoldier v. Woodford , 418 F.3d 989, 995 (9th Cir. 2005) (RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs").
Under RLUIPA, a prisoner must show that the relevant exercise of religion is grounded in a sincerely held religious belief and not some other motivation. Holt , 135 S.Ct. at 862. Next, the inmate bears the burden of establishing that a prison policy constitutes a substantial burden on that exercise of religion. Id. ; Warsoldier , 418 F.3d at 994 (citing 42 U.S.C. § 2000cc-2(b) ).
If the inmate makes those two showings, the burden shifts to the government to prove that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. Warsoldier , 418 F.3d at 995. This compelling governmental interest test imposes a much stricter burden on the government than the First Amendment's alternative means test. See Holt , 135 S.Ct. at 862 ; Greene v. Solano Cnty. Jail , 513 F.3d 982, 986 (9th Cir. 2008).
B. Discussion
1. Count I-Nutritional Adequacy of Kosher Meals
a. First Amendment Analysis
With respect to religious diets, prisoners "have the right to be provided *1356 with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." McElyea v. Babbitt , 833 F.2d 196, 198 (9th Cir.1987). There is no dispute that the religious practice at issue here-the provision of an adequate kosher diet-concerns a sincerely held belief and that Sprouse's claim is rooted in religious belief. See Malik , 16 F.3d at 333.
Thus, the next step in the analysis is whether Sprouse can demonstrate a substantial burden on his religious belief. See Shakur , 514 F.3d at 884. Sprouse alleged that the kosher diet he receives has insufficient calories for him to maintain his health. (Doc. 1 at 3.) Defendants submit copies of the "Statements of Nutritional Adequacy" for the kosher diet meal plans from 2012 and 2016. (Doc. 69, Ex. 1, Attach. J (Doc. 69-3 at 49-55).) These Statements are signed by Trinity's dietician and certify that the kosher diet meal plans provide an average calorie count of approximately 2800 calories per day. (Id. )
Sprouse disputes that the kosher diet meal plans provide this many calories, and he notes that Defendants do not provide any information of the calorie count for the daily kosher meals. (Doc. 71 at 5.) Sprouse had previously requested this information from Defendants, to no avail; therefore, he began to keep a record of the meals he received during various weeks in 2015 and, using a calorie counter guide, he calculated the caloric count for the items in each meal. (Id. at 5-6; Doc. 71, Ex. 3 & Attach. A (Doc. 71-4 at 1-17).[2] ) Sprouse provides two caloric counts for each day: one based on premium brands and grade of food (which yield higher calories), and one based on lower brands and grade of food (which yield lower calories). (Id. )[3] Defendants do not dispute Sprouse's record of meals or his calorie calculations in their Reply. (See Doc. 75.)[4] Defendants nonetheless make the general assertion that Sprouse fails to provide evidence that contradicts the "Statements of Nutritional Adequacy," which purport to show that the kosher diet meal plans provide an average of 2800 calories per day. (Id. at 2-3.)
The Court has reviewed Sprouse's meal records and calorie counts for four weeks from July-October 2015. (Doc. 71, Ex. 3 (Doc. 71-4 at 1-17).) When taking the average of the two calorie counts for each day, the average daily calories for these weeks were approximately 2133 (week of July 6, 2015); 2207 (week of Aug. 10, 2015); 2210 (week of Sept. 7, 2015); and 2226 (week of Oct. 12, 2015). (See Doc. 71-4 at 1-17).) Although these calorie calculations are not exact, the evidence is sufficient to support that the kosher diet meal plans provide a calorie count closer to 2150-2200 calories per day, not 2800 calories per day.
Nonetheless, Sprouse fails to present specific facts or evidence to show that receiving just 2150-2200 calories a day is inadequate, thereby forcing him to forgo or significantly alter his religious practice to maintain proper nutrition. According to his own evidence, the estimated calorie requirement for a male his age-over 50 *1357 years old-with a sedentary lifestyle is 2000-2200 calories a day. (Doc. 71, Ex. 3 (Doc. 71-4 at 39).)[5] Sprouse does not allege that he lost weight or suffered other health effects as result of eating just 2150-2200 calories a day. More importantly, he does not allege that he had to supplement his diet with non-kosher items from the commissary or non-kosher bartered foods, or that he had to take any other action that effectively forced him to violate his religious practice in order to get sufficient calories. See Ohno , 723 F.3d at 1011 (substantial burden exists where the plaintiff is pressured to modify his behavior and violate his beliefs). As such, Sprouse fails to demonstrate that he was subject to a substantial burden.
In light of this determination, the Court need not conduct an analysis under Turner to determine whether a kosher diet plan providing just 2150-2200 calories per day serves a legitimate penological interest. Summary judgment will be granted as to the First Amendment claim in Count I.
b. RLUIPA Analysis
There is no dispute that the exercise of religion at issue here is grounded in a sincerely held religious belief. See Holt , 135 S.Ct. at 862.
Sprouse therefore must show that the kosher diet meal plan provided to him substantially burdens the exercise of his religious beliefs. The RLUIPA substantial-burden test is the same as that used under the First Amendment. See Warsoldier , 418 F.3d at 995-96 (citing to First Amendment cases to determine what constitutes a substantial burden under RLUIPA); See also Nelson v. Miller , 570 F.3d 868, 877 (7th Cir. 2009) (the First Amendment and RLUIPA both use the substantial-burden test); Meza v. Cal. Dep't of Corrs. , No. 1:17-cv-00894-DAD-EPG, 2017 WL 5500625, at *5 (E.D. Cal. Nov. 16, 2017) ("[t]he RLUIPA substantial burden test is analyzed within the same Free Exercise Clause framework") (citing Int'l Church of Foursquare Gospel v. City of San Leandro , 673 F.3d 1059, 1067 (9th Cir. 2011) ). The Court has already determined that Sprouse fails to present any facts or evidence to show that a kosher diet meal plan providing an average of 2150-2200 calories per day substantially burdens the exercise of his religion.
Accordingly, the Court does not reach the "compelling governmental interest" test, and summary judgment will be granted as to the RLUIPA claim in Count I.
2. Count II-Mincing of Vegetables
In his Response, Sprouse clarifies that this Count is limited to the mincing of his cabbage. (Doc. 71 at 8.) Sprouse argues that mincing the cabbage increases the likelihood of contamination with non-kosher items. (Id. ) He maintains that his religious practice is substantially burdened because the probability of a piece of minced cabbage becoming contaminated is higher than a wedge of cabbage becoming contaminated. (Id. at 9.)[6]
Defendants contend that Sprouse's speculation about potential contamination does not support a claim rooted in religious belief and that his claim is "a purely secular philosophical concern" that does not *1358 satisfy the initial showing in the First Amendment analysis. (Doc. 75 at 5.) Defendants further contend that Sprouse's speculation that minced cabbage could be contaminated does not constitute a substantial burden. (Id. )
Assuming, arguendo, that Sprouse's desire to eat a non-contaminated kosher diet could be considered a sincerely held belief rooted in religious faith, Sprouse fails to satisfy the substantial burden prong. Sprouse must show that the government action burdened his religious practice; yet, Sprouse does not allege that he has ever received contaminated cabbage. Defendants' evidence establishes that measures are taken to ensure that contamination does not occur in the preparation of kosher meals. (Doc. 69 ¶¶ 9-10.) Sprouse's response to this evidence-that "it does not matter about the kosher tools" or how they are cleaned-is insufficient to create a material factual dispute as to whether contamination occurs. (Doc. 71 at 9.) See Taylor v. List , 880 F.2d 1040, 1045 (9th Cir. 1989) (conclusory allegations unsupported by factual data are insufficient to defeat a summary judgment motion). Moreover, Sprouse does not allege that the fear of contamination has affected his kosher dietary practice or caused him to modify his behavior in any way such that he must violate his religious beliefs.
In short, Sprouse fails to satisfy his burden of showing that the mincing of cabbage in the kosher diet meals burdens his exercise of religion. That ends the analysis under both the First Amendment and RLUIPA, and summary judgment will be granted as to both these claims in Count II.
3. Count IV-Beef in Kosher Meals
In their Motion for Summary Judgment, Defendants do not challenge that Sprouse has a sincerely held belief that eating beef is an important part of his religious diet. (See Doc. 68 at 7.) In their Reply, however, they question Sprouse's belief that he must eat beef and suggest that relevant scripture only states that eating beef is permitted, not mandated. (Doc. 75 at 9.) But the right to religious practice "is not limited to beliefs which are shared by all of the members of a religious sect." Thomas v. Review Bd. of Indiana Employment Sec. Division , 450 U.S. 707, 715-16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Thus, Sprouse does not have to show that eating beef is mandated by his religion; he need only show that he sincerely believes eating beef is consistent with his faith. See Shakur , 514 F.3d at 884-85. Because the question of sincerity "is, of course, a question of fact[,]" it cannot be decided at summary judgment. United States v. Seeger , 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).
Therefore, the next step under both the First Amendment and RLUIPA analyses is whether Sprouse can demonstrate a substantial burden on his religious belief. See Shakur , 514 F.3d at 884. Sprouse asserts that Defendants' failure to provide him beef substantially burdens his beliefs and free exercise of religion. (Doc. 71 at 13.) He submits copies of the food labels for the current meals trays, including Salisbury steak, and asserts that these meals do not appear to be beef. (Id. at 12 & Ex. 22 (Doc. 71-6 at 15).) These food labels do not include the ingredients; however, they identify the manufacturer as the Gourmet Kosher company and bear the "OU" symbol. (Id. )
The ADC Food Services Liaison acknowledges that the kosher beef meal is not 100% beef but fails to provide specific ingredient information. (Doc. 69, Ex. 1, Haight Decl. ¶ 18.) Defendants argue that Sprouse's religious beliefs are not substantially burdened by the substitution of a beef meal with a non-beef meal and that even if he receives no beef, Sprouse's *1359 rights are not violated because he receives food that sustains his health and satisfies the dietary laws of his religion. (Doc. 75 at 10.)
Other courts have held that "[p]risoners have no right to any particular quantum of meat in their diets[,]" even religious diets. Fonseca v. Cal. Dep't of Corrs. and Rehab. , No. 14cv787-LAB (BLM), 2015 WL 4172194, at *4 (S.D. Cal. July 10, 2015) (claim that prisoner was served fish more often than beef did not amount to a substantial burden on sincerely held religious belief); see Shoemaker v. Williams , No. CV 10-0826-JO, 2013 WL 528306, at *2 (D. Or., Feb.11, 2013) (rejecting prisoner's claim that meat-free diet infringed his religious rights). Although the amount of actual beef within the kosher beef meals is not known, there is no dispute that the beef meals Sprouse receives are kosher and otherwise nutritionally adequate. Sprouse does allege that that the lack of 100% beef meals has forced him to engage in behavior that interferes with or violates his beliefs. On this record, Sprouse fails to meet his burden to show a substantial burden on his religious beliefs. This ends the analysis for both religious claims, and summary judgment will be granted as to the First Amendment and RLUIPA claims in Count IV.
4. Count V-Food Trays
Defendants do not contest that Sprouse has a sincerely held belief in eating kosher meals that are not contaminated. The record establishes that the kosher meals are wrapped in cellophane, but the trays on which they are placed are not wrapped. (Doc. 71 at 14 & Ex. 26.) Sprouse asserts that using reusable, non-kosher trays "interferes with his spirituality and beliefs" and that a disposable tray is necessary to ensure that there is no contamination that would compromise the kosher integrity of the meals. (Doc. 71 at 14.) But Sprouse does not explain how the reusable trays interfere with his spirituality, nor does he allege that any of his wrapped kosher meals have ever been contaminated. Also, Sprouse does not allege that the meals are not securely wrapped such that food ever directly touches the tray, and he does not claim that he has ever been unable to eat a kosher meal because it appeared to have been compromised due the tray.
Like his claim regarding minced cabbage, Sprouse demonstrates only a fear of contamination but presents no evidence that actual contamination has taken place or that this fear has affected his kosher dietary practice or caused him to modify his behavior in any way such that he must violate his religious beliefs. He therefore fails to show that his religious practice has been substantially burdened, and summary judgment will be granted as to the First Amendment and RLUIPA claims in Count V.
IV. Beard
Sprouse's remaining claims are the First Amendment free exercise, RLUIPA, and Fourteenth Amendment equal protection claims in Count III based on Ryan and Hetmer's refusal to permit Sprouse to grow out his beard in accordance with his religious beliefs.
A. First Amendment Analysis
As to the initial prong in the First Amendment analysis-whether Sprouse's belief in growing out his beard is sincerely held and rooted in religious belief-Defendants assert that Sprouse's vague reliance on unidentified portions of the Torah is insufficient to support that he is commanded to grow out his beard longer than one inch. (Doc. 68 at 13.) See Malik , 16 F.3d at 333. But the question is not whether the Jewish religion commands Sprouse to grow out his beard-such an inquiry *1360 amounts to the centrality test, which, as mentioned, the Supreme Court has disavowed. See Shakur , 514 F.3d at 884 (the plaintiff need not show that the religious practice at issue is required as a central tenet of the religion, only that he believes that the practice is consistent with his faith). Rather, the sincerity test determines whether the First Amendment applies, and there is nothing in the record that challenges Sprouse's sincere belief that he is personally required to grow out his beard beyond 1 inch to maintain his Jewish faith. In his Complaint, Sprouse averred that he believes Jewish males should not cut their beards. (Doc. 1 at 5.) In his grievances, Sprouse complained that the prison's policy limiting beard length denies him the ability to follow God's law in the Torah and thereby violates his religious practice. (Doc. 69, Ex. 2, Attach. A (Doc. 69-4 at 8, 13, 18).) As discussed above, Sprouse's sincerity is a question of fact, see Seeger , 380 U.S. at 185, 85 S.Ct. 850, and, taking his allegations as true for the purposes of summary judgment, he has established that he sincerely believes growing out his beard is consistent with his faith. See Shakur , 514 F.3d at 884-85.
Next, Sprouse must demonstrate that the ADC policy limiting beard length to 1 inch constitutes a substantial burden on his religious exercise. Defendants argue that Sprouse cannot show that the beard policy substantially burdens Sprouse's religious practice because he does not explain how his religious beliefs are violated. (Doc. 68 at 12-13.)[7]
Cases that address whether a prison grooming policy subjects a prisoner to a substantial burden tend to focus on the punishments imposed on the prisoner for violating the policy. For example, in Warsoldier , the prison grooming policy prohibited inmates from maintaining their hair longer than 3 inches; however, the plaintiff, who was Native American, believed that he could only cut his hair upon the death of a close relative and, in keeping with his religion, he kept his hair long. 418 F.3d at 991-92. As a result of violating the grooming policy, the plaintiff was repeatedly punished in the form of cell confinement, extra duty hours, loss of privileges, and the denial of outside recreation. Id. at 995-96. The Ninth Circuit found a substantial burden because punishments that coerce a religious adherent to forgo his religious beliefs infringes on religious exercise. Id. at 996 (citing First Amendment cases); see Thomas , 450 U.S. at 717-18, 101 S.Ct. 1425 ("putting substantial pressure on an adherent to modify his behavior and to violate his beliefs' infringes on the free exercise of religion"); Sherbert v. Verner , 374 U.S. 398, 404 n.5, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) ("[u]nder some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes").
Here, the record indicates that Sprouse has not been subject to any punishments for violating the ADC beard policy because he has complied with the length requirement, *1361 albeit under protest. By all accounts, this imposes a greater burden on Sprouse's religious exercise than if he grew out his beard and endured punishments for the policy violation because at least then he would still be engaged in religious conduct in accordance with his faith. As it stands, because he is a rule follower, the ADC beard policy prevents Sprouse from engaging in conduct which he sincerely believes is consistent with his faith. See Hernandez , 490 U.S. at 699, 109 S.Ct. 2136. This is sufficient to establish a question of fact whether the ADC beard policy and Ryan and Hetmer's refusal to grant Sprouse a shaving waiver constitutes a substantial burden on Sprouse's religious exercise. See Greene , 513 F.3d at 987 ("[w]e have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise").
The Court must therefore proceed to the final step in the First Amendment analysis, which considers whether the ADC beard policy is reasonably related to legitimate penological interests and therefore valid. Turner , 482 U.S. at 89, 107 S.Ct. 2254. But here, because they summarily conclude that there is no substantial burden to Sprouse's religious beliefs, Defendants fail to address any of the Turner factors. As a result, they fail to satisfy their summary judgment burden on this element, and material factual disputes remain as to the Count III free-exercise claim. See Celotex , 477 U.S. at 331, 106 S.Ct. 2548 (initial burden requires the movant to present evidence that negates an essential element of the nonmovant's claim). Defendants' request for summary judgment on this claim will be denied.
B. RLUIPA Analysis
Defendants do not separately address Sprouse's RLUIPA claim in Count III. Instead, for the same reasons as set forth above with respect to the First Amendment claim, Defendants contend that Sprouse cannot meet the substantial burden standard under RLUIPA. Again, the substantial burden test under RLUIPA is the same as that employed under the First Amendment. See Warsoldier , 418 F.3d at 995-96. Because Sprouse has established a question of fact as to whether the ADC policy constitutes a substantial burden under the First Amendment, he establishes a question of fact as to whether the policy constitutes a substantial burden under RLUIPA. See Holt , 135 S.Ct. at 862 (finding a substantial burden under RLUIPA where the prison policy requires the plaintiff to shave his beard and thus engage in conduct that seriously violates his religious belief in growing a beard, and if he violates that policy, he faces disciplinary action).
Thus, the burden shifts to Defendants to show that the ADC beard policy furthers a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. § 2000cc-1(a). Defendants wholly fail to address the compelling governmental interest test. As such, they cannot satisfy their summary judgment burden on this element, and summary judgment on the RLUIPA claim in Count III will be denied.
C. Equal Protection
1. Governing Standard
The Equal Protection Clause requires the State to treat all similarly situated people equally, and this right extends to prisoners. See City of Cleburne v. Cleburne Living Ctr. , 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ; Wolff v. McDonnell , 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The Equal Protection Clause entitles each prisoner to "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere *1362 to conventional religious precepts." Cruz v. Beto , 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (providing that Buddhist prisoners must be given opportunity to pursue faith comparable to that given Christian prisoners); see Allen v. Toombs , 827 F.2d 563, 569 (9th Cir. 1987) (the Equal Protection Clause requires prison officials to make "good faith accommodations of the prisoner's rights in light of practical consideration").
A plaintiff can establish an equal protection cause of action by demonstrating that the defendant intentionally discriminated on the basis of the plaintiff's membership in a protected class, such as race, religion, national origin, or poverty. Barren v. Harrington , 152 F.3d 1193, 1194-95 (9th Cir.1998) ; Damiano v. Fla. Parole & Probation Comm'n , 785 F.2d 929, 932-33 (11th Cir. 1986) ; but see United States v. Whitlock , 639 F.3d 935, 941 (9th Cir. 2011) (stating that prisoners do not constitute a suspect class for equal protection purposes).
Alternatively, a plaintiff can make an equal protection claim by establishing that the defendant intentionally treated the plaintiff differently from other similarly situated individuals without a rational basis for the difference in treatment. Engquist v. Or. Dep't of Agric. , 553 U.S. 591, 601, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) ; Vill. of Willowbrook v. Olech , 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (recognizing the "class of one" theory). To support a "class of one" equal protection claim, "a plaintiff must identify the group of individuals with whom he is similarly situated, and identify his allegedly intentional and disparate treatment." Chappell v. Bess , No. 2:01-cv-01979 KJN P, 2012 WL 3276984, at *19 (E.D. Cal. Aug. 9, 2012) (citing McCollum v. Cal. Dep't of Corrs. and Rehab. , 647 F.3d 870, 880-81 (9th Cir. 2011) ). The plaintiff must show that this disparate treatment " 'was intentionally directed just at him, as opposed ... to being an accident or a random act.' " N. Pacifica LLC v. City of Pacifica , 526 F.3d 478, 486 (9th Cir. 2008) (quoting Jackson v. Burke , 256 F.3d 93, 96 (2d Cir. 2001) ). Finally, the plaintiff must show that the disparity in treatment was not "reasonably related to [any] legitimate penological interests." Shaw v. Murphy , 532 U.S. 223, 225, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001) (internal quotation marks omitted).
2. Discussion
Sprouse does not allege that Jewish inmates, as a group, are treated differently than inmates of other religions; therefore, his equal protection claim is appropriately viewed as a class-of-one claim. See Lazy Y Ranch Ltd. v. Behrens , 546 F.3d 580, 592 (9th Cir. 2008) ("the plaintiff in a 'class-of-one' case does not allege that the defendants discriminate against a group with whom she shares characteristics, but rather the defendants simply harbor animus against her in particular and therefore treated her arbitrarily").
Sprouse submits an April 2014 Inmate Grievance Appeal Response, which states that shaving waivers are granted to inmates when an inmate establishes a religious reason for the shaving waiver request. (Doc. 71, Ex. 15 (Doc. 71-5 at 22).) This demonstrates that there are a group of inmates who seek to grow out their beards for religious reasons, and Sprouse is similarly situated with this group.
The Inmate Grievance Appeal Response also establishes that some inmates within this group are in fact granted shaving waivers and allowed to grow out their beards beyond 1 inch for religious reasons. Sprouse's evidence includes the copy of a 2012 settlement agreement between the ADC and a Muslim inmate, Seymour J. Abdullah, which permits Abdullah "to *1363 maintain a 5-inch beard to practice Islam as long as" he is in ADC custody. (Id. , Ex. 16.)[8] Thus, there can be no dispute that some inmates who seek to grow their beards beyond 1 inch for religious reasons are permitted to do so. But not Sprouse; despite grievance requests to Hetmer and Ryan and the filing of a lawsuit, Sprouse has been denied a shaving waiver to grow out his beard for religious reasons. (See Doc. 69, Ex. 2, Attachs. E-H (Doc. 69-4 at 18-26).) From this evidence, the inference can be made that the denial of a shaving waiver was not an accident or oversight, but that Sprouse has intentionally been treated differently than other similarly situated individuals.
Defendants argue that there is no evidence that the difference in treatment is not based on a rational relationship to a legitimate state purpose. (Doc. 68 at 14; Doc. 75 at 9.) However, Defendants do not state what the legitimate state purpose is or how the difference in treatment serves that purpose. As discussed above, Defendants fail to present any argument that denial of a shaving waiver is reasonably related to a legitimate penological interest. Sprouse argues that because inmates are permitted shaving waivers for religious reasons and inmates are allowed to grow long hair-facts that Defendants do not dispute-there is no legitimate penological interest in refusing Sprouse's request to grow out his beard in accordance with his faith. (Doc. 71 at 10-11.) On this record, there exists a question of fact whether the disparity in treatment is reasonably related to a legitimate penological interest.
For the above reasons, summary judgment will be denied as to the equal protection claim in Count III.
V. Qualified Immunity
As to the First Amendment free-exercise claim in Count III, Ryan and Hetmer argue that they are entitled to qualified immunity.[9]
A. Legal Standard
Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald , 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The qualified immunity doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and it protects "all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd , 563 U.S. 731, 743, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (internal quotation omitted). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. Pearson v. Callahan , 555 U.S. 223, 230-32, 235-36, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (courts may address either *1364 prong first depending on the circumstances in the particular case).
For a right to be clearly established there does not have to be a case directly on point; however, " 'existing precedent must have placed the statutory or constitutional question beyond debate.' " White v. Pauly , --- U.S. ----, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (quoting Mullenix v. Luna , 577 U.S. ----, ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) ). Clearly established law "must be particularized to the facts of the case," and "should not be defined at a high level of generality." White , 137 S.Ct. at 552 (quotation and citation omitted).
B. Discussion
The Court has already determined that there is question of fact whether Hetmer and Ryan's refusal to grant a shaving waiver for Sprouse to grow his beard beyond one inch for religious reasons violates Sprouse's First Amendment free-exercise rights. Qualified immunity therefore turns on the second prong-whether the right at issue was clearly established such that Defendants would have known that their conduct was unlawful. See Saucier v. Katz , 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
Defendants assert that at the relevant time, the seminal case regarding beard length was Friedman v. Arizona , in which the Ninth Circuit held that a prison regulation prohibiting beards did not violate the First Amendment. (Doc. 68 at 16, citing 912 F.2d 328, 333 (9th Cir. 1990) ). They state that through 2011, the Ninth Circuit applied Friedman and upheld beard and hair-length restrictions to First Amendment challenges. (Id. at 16-17, citing unpublished cases dating from 1991-2011.) Defendants conclude that, as a result, in 2014, there was no clearly established law that would have placed Defendants on notice that their denials of Sprouse's requests to grow his beard beyond the length permitted under ADC policy violated his First Amendment rights. (Id. at 17.)
In determining whether a right is clearly established, the Court first looks to binding precedent from the Supreme Court or the Ninth Circuit. Mattos v. Agarano , 590 F.3d 1082, 1089 (9th Cir. 2010). From there, the Court looks to "whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." Boyd v. Benton Cnty. , 374 F.3d 773, 781 (9th Cir. 2004) (quoting Drummond v. City of Anaheim , 343 F.3d 1052, 1060 (9th Cir. 2003) (internal quotations omitted) ). Unpublished district court decisions "may inform our qualified immunity analysis," but "absent any published opinions on point or overwhelming obviousness of illegality[,]" a right is rarely clearly established. Sorrels v. McKee , 290 F.3d 965, 971 (9th Cir. 2002).
As stated by Defendants, in 1990, the Ninth Circuit held that an Arizona prison regulation banning beards altogether did not violate the First Amendment. Friedman , 912 F.2d at 333. In 2004, the Ninth Circuit upheld a First Amendment free exercise challenge, brought by a Native American inmate, to a California prison grooming regulation that restricted the length of male inmates' hair. Henderson v. Terhune , 379 F.3d 709, 715 (9th Cir. 2004). The next year, the Ninth Circuit found that the same California prison hair length regulation violated RLUILA. Warsoldier , 418 F.3d at 997-98. But that finding did not affect the circuit court's prior conclusion that the regulation did not violate the First Amendment. See id. at 998 n.8 (distinguishing Warsoldier from Henderson and noting that the decisions did not conflict because Henderson involved a First *1365 Amendment challenge only). Thereafter, in unpublished dispositions, the Ninth Circuit and district courts within the circuit continued to rely on Friedman in dismissing First Amendment claims challenging inmate beard restrictions. See Rognirhar v. Grannis , 463 F. App'x 612, 615 (9th Cir. 2011) ; Von Staich v. Hamlet , Nos. 04-16011, 06-17026, WL 3001726, at *2 (9th Cir. 2007) ; Hundal v. Salazar , No. EDCV 08-00543-CAS (MAN), 2010 WL 761223, at *4 (C.D. Cal., March 3, 2010) ; Quillar v. Cal. Dep't of Corrs. , No. CIV S-04-1203 FCD KJM P, 2007 WL 2069942, at *3 (E.D. Cal. July 13, 2007).
It was not until 2014 that this Court denied qualified immunity to an ADC official on an inmate's claim that denial of a shaving waiver violated his First Amendment free-exercise rights. Halloum v. Ryan , No. CV 11-0097-PHX-RCB, 2014 WL 1047144, at *17 (D. Ariz. March 18, 2014). But this decision was issued at the same time that Sprouse was grieving the denial of a shaving waiver to grow out his beard. (See Doc. 69, Ex. 2 Attachs. A-H (grievance documents dated Feb. 24, 2014-April 22, 2014) (Doc. 69-4 at 8-26).) As such, the Halloum decision-a single case against a prison chaplain-was not sufficient to put Hetmer and Ryan on notice that their conduct violated Sprouse's free exercise rights. Defendants are therefore entitled to qualified immunity as the First Amendment claim in Count III.
IT IS ORDERED:
(1) The reference to the Magistrate Judge is withdrawn as Defendants' Motion for Summary Judgment (Doc. 68).
(2) Defendants' Motion for Summary Judgment (Doc. 68) is granted in part and denied in part as follows:
(a) the Motion is granted as to Counts I, II, IV, and V, and these Counts are dismissed with prejudice;
(b) the Motion is granted as to the First Amendment free exercise claim in Count III on qualified immunity grounds, and this claim is dismissed with prejudice; and
(c) the Motion is otherwise denied.
(3) Fizer is dismissed as a Defendant.
(4) The remaining claims are the RLUIPA claim and Fourteenth Amendment equal protection claim against Ryan and Hetmer in Count III.

The Court issued an Order with the Notice required under Rand v. Rowland , 154 F.3d 952, 962 (9th Cir. 1998) (en banc), which notified Sprouse of his obligation to respond to the Motion for Summary Judgment and the requirements of Federal Rule of Civil Procedure 56. (Doc. 70.)

Sprouse uses the calorie guide by Lea Ann Holzmeister, The Ultimate Calorie, Carb, and Fat Gram Counter (2nd ed., Small Steps Press 2010). (Doc. 71, Ex. 3, Attach. A (Doc. 71-4 at 30).)

Sprouse asserts that he more often received the lower grade of food; however, he does not state how he knows this, and there is no evidence indicating the food brands he received. (Doc. 71 at 6.)

Notably, Defendants' evidence includes a response to Sprouse's grievance on the topic from Warden Hetmer, who stated that nutritional information for the kosher menu is not available because the contract between ADC and Trinity does not require Trinity to provide that information. (Doc. 69, Ex. 1, Attach. A (Doc. 69-1 at 21).)

Sprouse relies on a publication of the Department of Agriculture; U.S. Department of Health and Human Services, Dietary Guidelines for Americans, 2010 . (Doc. 71, Ex. 3 (Doc. 71-4 at 39).)

Sprouse also argues that Defendants' mincing of his cabbage violates his equal protection rights under the Fourteenth Amendment because another Jewish inmate is provided cabbage in a wedge. (Doc. 71 at 8-9.) The equal protection claims in Count II were dismissed on screening and therefore will not be addressed. (Doc. 9.)

Defendants also point to Sprouse's assertion that he should be able to grow his beard "with no limitation on length" and his argument that a Muslim inmate was permitted to grow a five inch beard and contend that, in light of Sprouse's "implied approval" of a five-inch beard, he contradicts his belief in growing a beard with no limitation in length and cannot show a substantial burden. (Doc. at 7-8.) Sprouse did not make contradictory statements regarding his desired beard length. His argument that a Muslim inmate has been allowed to grow a 5-inch beard goes to his equal protection claim, which is based on assertions that another inmate received more favorable treatment, not that the other inmate received the precise treatment Sprouse seeks. (Doc. 71 at 10.)

A copy of the 2012 settlement agreement was filed in Abdullah's case, and that case is not sealed; thus, the document is public record. (CV 08-00255-TUC-CKJ, Doc. 129, Ex. 2 (Doc. 129-1 at 7-12).)

A RLUIPA claim may proceed only for injunctive relief against Defendants in their official capacity. See Wood v. Yordy , 753 F.3d 899, 904 (9th Cir. 2014). Qualified immunity does not bar a suit for injunctive relief, see Presbyterian Church (U.S.A.) v. United States , 870 F.2d 518, 527 (9th Cir. 1989), and qualified immunity is not available as a defense in an official-capacity suit. Kentucky v. Graham , 473 U.S. 159, 167, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Therefore, the qualified immunity defense does not apply to Sprouse's RLUIPA claim.