**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KENNETH DANIEL TIEDEMANN,

*Plaintiff-Appellant*,

v.

BARBARA VON BLANCKENSEE;
GENE BEASLEY; SCOTT YOUNG,

*Defendants-Appellees*,
and

MARY M. MITCHELL, Regional
Director; J. T. SHARTLE, Warden;
RAFAEL ZUNIGA,

*Defendants*.

No. 21-15073

D.C. No.  4:17-
cv-00597-CKJ

OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted April 12, 2023
San Francisco, California

Filed July 3, 2023

Before:  Sidney R. Thomas and Holly A. Thomas, Circuit
Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Rakoff

---

## SUMMARY[**]

### Prisoner Civil Rights / Familial Association / *Bivens*

The panel affirmed in part and reversed in part the
district court's dismissal of an action brought by Daniel
Tiedemann, a federal prisoner, challenging the 300-minute-
per-month cap on his phone calls applied by the federal
Bureau of Prisons ("BOP"), and remanded.

Tiedemann argued that BOP, by applying the policy to
him without exemption, unconstitutionally infringed on his
First and Fifth Amendment rights to familial association
with his three children.  Although the district court found
that Tiedemann stated plausible First and Fifth Amendment
claims, it dismissed his claims as moot after BOP moved
Tiedemann between facilities, since his complaint did not
name the new facility's warden.

Although the panel agreed with the district court that
Tiedemann's claims for injunctive relief were moot as to his
two previous wardens who were no longer in a position to

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the
Southern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

grant Tiedemann relief at his present facility, one defendant—BOP's regional director for the Western Region—still plausibly had authority to redress his claimed injury by directing his current warden to offer him more phone time. And even if that were not the case, the district court clearly erred by offering Tiedemann no opportunity to amend his complaint to name his current warden, since amendment would have resolved the sole stated ground for dismissal. Accordingly, the panel affirmed the district court's dismissal of Tiedeman's claim for injunctive relief as to his two former wardens, reversed the district court's dismissal of Tiedemann's claim for injunctive relief as to the Regional Director defendant, and held that Tiedemann should be given leave to amend his complaint to add his current warden as a co-defendant.

The panel next declined to affirm the district court's dismissal on the alternative ground that Tiedemann failed to state a claim. The Government did not here dispute that its policy limiting incarcerated persons' phone time at least implicates their First and Fifth Amendment interests in free association with family and others. The constitutionality of BOP's policy as applied to Tiedemann, therefore, depended on whether it was reasonably related to legitimate penological objectives. While this standard is deferential to BOP, it also requires factual determinations ill-suited to resolution on the pleadings. Thus, the panel held that Tiedemann plausibly alleged a claim that survived the pleading stage.

The panel affirmed the district court's dismissal of Tiedemann's claim for money damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), because, as Tiedemann acknowledged,

his *Bivens* claim was correctly dismissed pursuant to binding Ninth Circuit and Supreme Court precedent.

## COUNSEL

Sarah Dupree (argued) and Rachel Smith (argued), Certified Law Students; William Fernholz and Jamie Crook, Supervising Attorneys; UC Berkeley School of Law; Berkeley, California; for Plaintiff-Appellant.

Terry M. Crist III, Assistant United States Attorney; Christina M. Cabanillas, Deputy Appellate Chief; Gary M. Restaino, United States Attorney, District of Arizona; United States Attorney's Office; Tucson, Arizona; Denise A. Faulk, Assistant United States Attorney; United States Attorney's Office; Phoenix, Arizona; for Defendants-Appellees.

## OPINION

Rakoff, District Judge:

Appellant Kenneth Daniel Tiedemann, a federal prisoner, challenges the 300-minute-per-month cap on his phone calls applied by the federal Bureau of Prisons ("BOP"). Tiedemann argues that BOP, by applying the policy to him without exemption, unconstitutionally infringes on his First and Fifth Amendment rights to familial association with his three children.

Although the district court found that Tiedemann stated plausible First and Fifth Amendment claims, it dismissed his claims as moot after BOP moved Tiedemann between facilities, since his complaint did not name the new facility's warden. We hold that this was error. Tiedemann's complaint named as a defendant the regional director, who plausibly has authority to redress his claimed injury by directing his current warden to offer him more phone time. And even if that were not the case, the district court clearly erred by offering Tiedemann no opportunity to amend his complaint to name his current warden, since amendment would have resolved the sole stated ground for dismissal.

The Government alternatively invites us to affirm the district court's dismissal on the ground that Tiedemann failed to state a claim. We decline. The Government does not here dispute that its policy limiting incarcerated persons' phone time at least implicates their First and Fifth Amendment interests in free association with family and others. Accordingly, the constitutionality of BOP's policy as applied to Tiedemann depends on whether it is reasonably related to legitimate penological objectives. *See Turner v. Safley*, 482 U.S. 78, 89–91 (1987). While this standard is deferential to BOP, it also requires factual determinations ill-suited to resolution on the pleadings, and Tiedemann's complaint renders it plausible that BOP's phone policy fails this deferential test. We therefore reverse the district court's dismissal of Tiedemann's suit for injunctive relief.[1]

---

[1] We do, however, affirm the district court's dismissal of Tiedemann's claim for money damages under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Tiedemann acknowledged both in his reply brief and at oral argument that his *Bivens*

## I.   BACKGROUND

In late 2017, Tiedemann sued his then-warden at United States Penitentiary, Tucson ("USP Tucson"), his former warden at Federal Correctional Institution ("FCI") Mendota, and the BOP regional director for the Western Region, alleging that BOP's application of its 300-minute per month cap on phone calls violated Tiedemann's Fifth Amendment rights to substantive due process and equal protection, and seeking both injunctive relief and a *Bivens* damages remedy. Tiedemann filed an amended *pro se* complaint in early 2018, in which he explained that he is a father of three children and that, prior to his incarceration, he was the sole caretaker for his two oldest sons. He alleged that he has remained close with his children while behind bars. When initially incarcerated at a privately run facility from 2014 through 2016, Tiedemann spoke with his children on the phone for "an average of 30-45 minutes a day" and "sometimes much longer," which enabled him to continue to play a significant role in their lives as they grew up.

When transferred in 2017 to a BOP facility, however, Tiedemann became subject to BOP policy that limits all prisoners to 300 minutes (5 hours) per month of phone time absent "good cause." U.S. Dep't of Just., Fed. Bureau of Prisons, Program Statement P5264.08: Inmate Telephone Regulations § 8(f) (2008) ("Telephone Regulations").[2] Tiedemann alleges that this limit of about 10 minutes per day "interfered with [his] daily communication with his children" and thereby damaged his ability to parent and his

---

claim was correctly dismissed pursuant to binding Ninth Circuit and Supreme Court precedent, and we agree.

[2] For the purposes of this summary, we accept Tiedemann's well-pleaded allegations as true.

children's mental health and academic success. He accordingly requested his warden at FCI Mendota to give him more phone time; when the request was denied, Tiedemann appealed that denial to the regional director, who approved the warden's decision because Tiedemann failed to show "good cause." Tiedemann was then transferred from FCI Mendota to USP Tucson, where he once again requested more phone time. But the new warden rejected his request as a duplicate of Tiedemann's previously-denied request at FCI Mendota.

Tiedemann sued in federal district court, seeking both injunctive relief and a *Bivens* damages remedy. He alleged that BOP's application of its 300-minute cap and its failure to make any exception in his case unconstitutionally infringed his substantive due process right to a parent-child relationship and denied him equal protection. Shortly after filing suit, Tiedemann was transferred to a third facility, FCI Herlong, at which point he submitted a *pro se* motion for a temporary stay of the litigation on the ground that he might not have access to legal mail while in transit. Tiedemann noted that he would update the court with his new address once he was placed at a new facility, which he ultimately did.

The district court initially issued a screening order dismissing the case with prejudice for failure to state a claim and denying as moot Tiedemann's motion to stay the proceedings. The district court concluded that Tiedemann failed to state an equal protection claim because he had not alleged that he was intentionally treated differently from others who were similarly situated, and that he had failed to state a due process claim under the standards governing prisoners' procedural due process claims. The district court likewise concluded that Tiedemann could not pursue a *Bivens* damages claim because his claims arose in a new

context and special factors counseled against extending *Bivens*. *See Ziglar v. Abassi*, 582 U.S. 120, 135 (2017)). Tiedemann, who was then in transit between facilities, did not receive the dismissal order for several months after the district court issued it. Before receiving the dismissal order, Tiedemann filed a "motion for information," asking whether, in light of his transfer, he would need to once again exhaust administrative remedies at the new facility, which "would result in further amendments with new defendants." The motion explicitly asked whether it was "necessary to constantly be adding new defendants," or whether the case could proceed as it was. The district court, as part of its dismissal order, denied as moot this motion for information.

Tiedemann appealed the screening order, and a prior panel of this Court reversed in part in an unpublished opinion. *Tiedemann v. Mitchell*, 778 Fed. App'x 461 (9th Cir. 2019). The panel affirmed the district court's dismissal of the equal protection claim but reversed dismissal of the due process claim because the district court had misunderstood it as sounding in procedural due process, when in fact "Tiedemann alleged a substantive due process claim predicated on his fundamental liberty interest in a relationship with his children." *Id.* at 461. This Court also encouraged the district court on remand "to consider whether, liberally construing the operative complaint, Tiedemann alleged a First Amendment freedom of association claim." *Id.* at 462. Our Court did not address the sufficiency of Tiedemann's claims, instead "remand[ing] for the district court to consider in the first instance whether the allegations 'are sufficient to warrant ordering [defendants] to file an answer.'" *Id.* at 461–62 (quotations omitted). We also did not address the merits of Tiedemann's claim for damages under *Bivens*, instead stating that "Tiedemann may

appeal [the dismissal of his *Bivens* claim] upon the district court's entry of judgment on his claims for injunctive relief." *Id.* at 462.

On remand, the district court found that Tiedemann stated both Fifth Amendment substantive due process and First Amendment freedom of association claims for injunctive relief and accordingly ordered defendants to answer. Defendants (Tiedemann's former wardens at FCI Mendota and USP Tucson and the regional director responsible for both facilities, as well as Tiedemann's new facility at FCI Herlong) then moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). They argued that Tiedemann no longer had standing to pursue injunctive relief because he had not named his new warden at FCI Herlong and because BOP policy vested discretion to allow upward departures from the 300-minute cap in prison wardens, rather than in the regional director. Defendants also argued that Tiedemann failed to state plausible Fifth and First Amendment claims.

The district court granted the motion to dismiss under Fed. R. Civ. P. 12(b)(1), concluding that Tiedemann lacked standing to pursue injunctive relief against the previously named defendants. The court reasoned that Tiedemann's former wardens could not grant him any further phone time, and that because BOP policy vested discretion to grant additional phone time in BOP wardens, rather than in the regional director, an injunction against the regional director would also be ineffective. The district judge also denied Tiedemann's request to file an amended complaint naming Tiedemann's current warden at FCI Herlong, reasoning that the case "has been pending for nearly 3 years" and that "[p]laintiff has had ample time to file an amended complaint and to add parties" but had failed to do so. The court declined

to address defendants' Rule 12(b)(6) argument. Tiedemann moved for reconsideration, arguing that the 300-minute cap was the result of a system-wide policy and that he was still subject to it at FCI Herlong. The district court denied the motion for reconsideration and re-docketed it as a notice of appeal.

Following the latest dismissal, Tiedemann has been relocated twice more. He contends he remains at a significant distance from his sons and subject to the 300-minute cap. Appellant Letter at 1 (Dkt. 17).

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review the district court's dismissal for lack of subject matter jurisdiction de novo, taking plausible factual allegations as true and drawing reasonable inferences in Tiedemann's favor. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013). Pro se complaints "must be held to less stringent standards than formal pleadings drafted by lawyers," *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (internal quotation marks omitted), "especially when they are civil rights claims by inmates." *Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013). Denials of leave to amend are reviewed for abuse of discretion. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc). We may affirm the district court's dismissal "based on any ground supported by the record." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008).

## III. ANALYSIS

### A. Defendants' Motion to Supplement the Record

Before turning to the merits of Tiedemann's appeal, we first address defendants' motion to supplement the record to include Tiedemann's judgment of conviction. Defs. Mot. to Take Judicial Notice (Dkt. 35). Defendants argue that the statute under which Tiedemann was convicted provides "relevant background that contextualizes [Tiedemann's] claims and provides additional detail." We disagree.

Courts may of course "'take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'" *Kipp v. Davis*, 971 F.3d 939, 945 n.2 (9th Cir. 2020) (citation omitted). But defendants fail to specify how the statute of Tiedemann's conviction bears on the "matters at issue" in his appeal. There has been no suggestion that defendants based any part of their decision to deny Tiedemann additional phone time on of a concern that he should not be communicating with his children, nor did the district court base any part of its analysis on such reasoning. And any such suggestion would be implausible, since the undisputed record confirms that Tiedemann continues to have significant contact with his children—including up to 300 minutes per month of phone time. Because defendants fail to articulate any connection between Tiedemann's statute of conviction and the merits of his appeal, we conclude that defendants' motion to supplement the record should be denied. *See Cuellar v. Joyce*, 596 F.3d 505, 512 (9th Cir. 2010) (denying a motion for judicial notice where "the materials contained therein are not relevant to the disposition of this appeal").

### B. Whether Tiedemann's claim was moot because he has not named his current warden

Although the district court dismissed Tiedemann's complaint for failing to allege standing, the parties' briefing and argument focus on mootness, not standing. We agree that mootness provides the relevant framework, because the Government argues that BOP's post-filing decision to transfer Tiedemann between facilities rendered the named defendants incapable of addressing any alleged injury. *See West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022) ("It is the doctrine of *mootness*, not standing, that addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." (cleaned up)).

This distinction matters in two ways. First, while it was Tiedemann's burden to allege a concrete actual or impending injury redressable by defendants in order to establish standing, it is now defendants' burden "to establish that a once-live case has become moot." *Id.* Second, mootness involves in certain respects a more flexible inquiry than standing. For instance, while a party initiating a suit based on prospective harm must show such harm is "certainly impending," there are nonetheless "circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000).

We agree with the district court that Tiedemann's claims are moot as to his two previous wardens at FCI Mendota and USP Tucson, who are no longer in a position to grant Tiedemann relief at his present facility. However, we

conclude that one defendant—BOP's regional director[3] for the Western Region, a region that includes each BOP facility at which Tiedemann has been housed—has not met her burden to show that Tiedemann's claim is moot. Tiedemann's asserted injury springs from BOP's system-wide policy of capping prisoners' phone time at 300 minutes per month. Tiedemann's complaint plausibly suggests that the regional director has authority to offer him relief from that policy, and the regional director has failed to produce any convincing evidence that she in fact lacks such authority. And though Tiedemann's claims are clearly moot as to his former wardens, we also hold that the district court plainly erred by not offering Tiedemann the opportunity to amend his complaint to name his current warden.

### 1. Tiedemann's injury is caused by a system-wide policy

Defendants argue that because any individual warden could potentially grant Tiedemann an exemption from BOP's systemwide 300-minute-per-month cap on prisoners' phone time, Tiedemann's claim for injunctive relief becomes moot each time Tiedemann receives a new warden when he is moved between facilities. Here, that would mean Tiedemann's claim became moot when he was moved from USP Tucson (his second BOP facility, after FCI Mendota) to FCI Herlong. But it would also mean that even if Tiedemann had revived his claim by naming his warden at

---

[3] At the time when Tiedemann filed suit, this named defendant was Mary Mitchell. Mitchell has since been replaced as Regional Director for the Western Region by Melissa Rios-Marques. *See* Bureau of Prisons, Agency Leadership, https://www.bop.gov/about/agency/leadership.jsp (last visited June 12, 2023). On remand, the current regional director should be substituted as a defendant. *See Heiss*, 271 F.3d at 897 n.8.

FCI Herlong, it would nonetheless have become moot again when he was subsequently transferred from FCI Herlong to FCI Victorville. And if Tiedemann once again amended his complaint or brought a new suit to name the Victorville warden, his claim would once again have been mooted when he was transferred to FCI Lompoc.

Fortunately, our cases do not require this "whack-a-mole" approach to mootness. While a prisoner's transfer will naturally moot claims for prospective relief "as to conditions at [a former] particular facility," a prison transfer does not defeat jurisdiction where a prisoner's injury stems from a system-wide policy. *Nelson v. Heiss*, 271 F.3d 891, 897 (9th Cir. 2001). For instance, in *Dilley v. Gunn*, 64 F.3d 1365 (9th Cir. 1995), we held that a prisoner's challenge to a high-security prison's policies restricting access to its law library became moot following the prisoner's transfer "to a lower-level security institution," in part because the change in the prisoner's security designation made it very unlikely he would be transferred back to the original facility with restricted library access. *Id.* at 1367–69. By contrast, we have held that where a prisoner challenges a policy that applies across multiple institutions and has named at least one defendant capable of providing relief across those institutions, a prison transfer will not moot a case. *See Walker v. Beard*, 789 F.3d 1125, 1132 (9th Cir. 2015) (rejecting mootness where an imprisoned plaintiff challenged his classification "under the Housing Policy" as eligible to be housed with prisoners of other races, because "the Housing Policy . . . by its terms, regulates the housing of inmates throughout the California prison system, not just in [the plaintiff's] original prison."); *Nelson*, 271 F.3d at 897 (rejecting mootness argument where the prisoner asserted a

claim against the director of California's prisons who "set policy for the whole California prison system").

Defendants have not met their burden of showing that Tiedemann was only subject to the phone cap at his past facility. Indeed, defendants concede that BOP policy generally limits all prisoners across BOP facilities to 300 minutes of phone time per month. Telephone Regulations § 8(f). They emphasize, however, that individual wardens may grant extra time "for good cause," *id.*, and argue that because Tiedemann's complaint refers to the decisions by the FCI Mendota and USP Tucson wardens to deny Tiedemann's request for extra phone time, Tiedemann's suit does not challenge any systemwide policy.

This parsimonious reading of Tiedemann's complaint cannot be reconciled with our usual practice of liberally construing pro se complaints—"especially" civil rights claims brought by prisoners. *Blaisdell*, 729 F.3d at 1241. Tiedemann alleged that, following the denial of his initial request for a "good cause" accommodation by the warden at FCI Mendota and the BOP regional director, he made a subsequent request at USP Tucson. Tiedemann alleges that request was "rejected as a duplicate of what he filed at FCI Mendota." This allegation plausibly suggests that each BOP warden is not in fact exercising independent discretion with respect to whether to grant Tiedemann a good cause exemption.

Equally important, defendants' argument misapprehends how Tiedemann's asserted injury—which consists of defendants' alleged "interference [with] and severing of Tiedemann's parent-child relationship"—springs from defendants' alleged conduct. The injury began when Tiedemann was transferred from a private prison to BOP

custody and first became subject to BOP's "long-standing policy of limiting telephone time to 300 minutes [per] month." While this injury could certainly be redressed by an individual warden granting Tiedemann a "good cause" accommodation to the general policy, it *results* from the systemwide 300-minute cap. Tiedemann is thus totally unlike prisoners whose claims challenged conditions specific to one facility from which they have been moved and to which they were unlikely to be returned. *Cf. Dilley*, 64 F.3d at 1369. Rather, like the plaintiffs in *Walker* and *Nelson*, Tiedemann's injury springs from a policy that follows him across facilities. *Walker*, 789 F.3d at 1132; *Nelson*, 271 F.3d at 893–97.

### 2. Tiedemann has plausibly alleged that the Regional Director may offer him relief from BOP's system-wide policy

That leaves the question whether any named defendant can provide Tiedemann the relief he seeks. To be sure, two of the three named defendants—Shartle and Zuniga, Tiedemann's former wardens at USP Tucson and FCI Mendota—can no longer grant Tiedemann any effective relief, so Tiedemann's claims against them were correctly dismissed as moot. However, Tiedemann named a third defendant—Mary Mitchell, BOP's then-regional director for the Western Region—who allegedly approved the FCI Mendota warden's decision to deny Tiedemann any good cause accommodation. Tiedemann alleges that the Regional Director has "unjustly imping[ed] on Tiedemann's liberty interest" by applying the 300-minute cap to him without exemption. It therefore stands to reason that the Regional Director responsible for overseeing every BOP facility in which Tiedemann has been housed can, for the purposes of mootness, remedy Tiedemann's injury.

Somewhat startlingly, defendants dispute this, representing that the Western Regional Director "lacks the authority to carry out any injunctive relief that the district court could have ordered in response to the amended complaint." Defendants stake this claim on a negative inference drawn from a trio of authorities: *first*, the BOP policy statement that sets forth the 300-minute cap as well as wardens' authority to grant "good cause" exemptions from that cap; *second*, BOP's administrative grievance regulations; and *third*, a BOP program statement that describes various BOP officials' responsibilities relating to internal controls and accreditations. The inference works like this: BOP's telephone regulations set forth a general 300-minute-per-month phone cap but also permit wardens to grant good cause exceptions to that cap. Telephone Regulations § 8.f. BOP's administrative grievance regulations, meanwhile, empower prisoners to appeal adverse decisions by wardens (including, as relevant here, those denying additional telephone time) to the relevant regional director. 28 C.F.R. §§ 542.10, 542.15(a). A regional director may properly review a warden's denial of a good cause exemption, *id.*, as Tiedemann alleges happened here. However, since neither the telephone regulations nor the grievance regulations explicitly authorize the Regional Director to grant extra phone time except following an appeal from a warden's denial of a good cause exemption, any authority to do so must come from elsewhere. Since a program statement submitted by defendants that apparently outlines various BOP officials' authorities does not explicitly vest any such power in the Regional Director, the Regional Director, defendants represent, lacks any authority to effectuate relief. Bureau of Prisons, Program Statement 1210.23: Management Control and Program Review

Manual,     Program     Statement     § (8)(d)     (2002),
https://www.bop.gov/policy/progstat/1210_023.pdf
("Management Program Statement").

   This argument requires us to assume that the Regional
Director lacks general supervisory authority over wardens
within the director's region outside any authority explicitly
defined in the telephone or grievance regulations or the
Management Program Statement. We decline to do so on the
record before us. Assuming we may properly take judicial
notice of the Management Program Statement at the
pleading stage, the document on its face neither exhaustively
catalogues nor implicitly limits the power of BOP officials
to supervise their subordinates (and neither do the telephone
or grievance regulations). Rather, it describes different
officials' responsibilities with respect to a required annual
review and certification process. Management Control
Program Statement § 8. For example, with respect to the
BOP director, the document merely requires the "Director
[to] submit[] an assurance statement to the Attorney General
at the end of each fiscal year certifying that programs are
operating effectively and in accordance with applicable law,
and that systems of internal control are adequate to protect
resources." *Id.* § 8.a. It defies common sense to infer from
this quite sparse description of the BOP Director's
responsibilities that the Director lacks any power to
supervise subordinates not expressly otherwise delegated.[4]

---

[4] Indeed, such an extreme level of insulation of each subordinate officer's
decisions from a superior officer's review up the entire BOP hierarchy
might well raise constitutional concerns. *Cf. Seila Law LLC v. Consumer
Fin. Prot. Bureau.*, 140 S. Ct. 2183, 2197–2208 (2020) (discussing
constitutional limits on the insulation of lower-level officials from
presidential control and direction).

Moreover, while Tiedemann's complaint suffices in our view to plausibly establish that the BOP Regional Director could direct wardens within her region to grant Tiedemann extra phone time, we note that were we to look beyond Tiedemann's complaint to BOP's own materials—as defendants urge us to—BOP's website identifies the Regional Director for the Western Region as responsible for "oversee[ing] the operations of 19 facilities, including four detention centers, three high security penitentiaries, and three correctional complexes," and "responsible for the oversight and management of more than 4,600 employees, and the custody and care of approximately 20,300 inmates." Bureau of Prisons, About Our Agency: Regional Director for the Western Region, https://www.bop.gov/about/agency/bio_wxr.jsp (last visited June 12, 2023). The suggestion that the Regional Director holds the above-listed authority, but nevertheless lacks the authority to direct Tiedemann's current warden to offer Tiedemann more phone minutes, is implausible.

Further, even if we were to read BOP's regulations and internal documents in the tortured manner defendants urge, they sound in exhaustion, rather than in real limits on the authority of the Regional Director. As a matter of BOP policy, Tiedemann may be required to first petition his warden (as Tiedemann alleges he has done here with respect to his wardens at both FCI Mendota and USP Tucson) before seeking relief from the regional director. But we decline defendants' invitation to constitutionalize this administrative exhaustion requirement by holding that an official as to whom remedies have not been exhausted lacks any authority to remedy Tiedemann's injury. For these reasons, while we affirm the district court's dismissal of Tiedemann's claims as to his two past wardens as moot,

Tiedemann's claim against the regional director may proceed.

### 3. The District Court abused its discretion in denying Tiedemann any opportunity to amend

While we hold that Tiedemann's claim may proceed against the Regional Director, we also note that the district court abused its discretion in denying Tiedemann the opportunity to amend his complaint in order to proceed against his current warden. "Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." *Lopez*, 203 F.3d at 1130 (cleaned up). Here, the district court's sole basis for dismissing Tiedemann's claims for injunctive relief was that his complaint did not name his current warden, a problem that would have been rectified by allowing Tiedemann leave to amend the complaint to name that warden. While the district court reasoned that Tiedemann should have amended earlier, "delay, by itself, is insufficient to justify denial of leave to amend." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987). Further, Tiedemann did not cause any inordinate delay here, as he in fact filed a "motion for information" shortly after his transfer out of USP Tucson in which he asked whether he should exhaust administrative remedies and add "new defendants" at his new facility. That motion was never addressed on the merits, undermining the suggestion that Tiedemann was responsible for any inordinate delay.

Defendants speculate that amendment would be futile because Tiedemann has not adduced evidence showing he has exhausted administrative remedies at any of his new facilities. However, "[b]ecause the failure to exhaust is an

affirmative defense that defendants must plead and prove, the ultimate burden of proving that the inmate has not exhausted his claims remains with the defendants." *Fordley v. Lizarraga*, 18 F.4th 344, 351 (9th Cir. 2021). And, here, defendants have not established that Tiedemann has not exhausted administrative remedies as to his current warden, nor that he could not do so before filing any amended complaint. *See Akhtar v. Mesa*, 698 F.3d 1202, 1210 ("If . . . a plaintiff files an amended complaint adding new claims based on conduct that occurred after the filing of the initial complaint, the plaintiff need only show that the new claims were exhausted before tendering the amended complaint to the clerk for filing.").

## C. Tiedemann's complaint suffices to state a plausible claim

Defendants argue in the alternative that we should affirm the dismissal of Tiedemann's complaint because it fails to state a claim. Although the district court did not address defendants' arguments on this score, we "may affirm based on any ground supported by the record." *Johnson*, 534 F.3d at 1121. However, we do not agree that Tiedemann fails to state a claim. Rather, construing his complaint liberally, we think Tiedemann has plausibly alleged that BOP's 300-minute cap infringes Tiedemann's First and Fifth Amendment associational rights. While defendants may ultimately prevail if they show that this infringement is reasonably related to legitimate penological goals, we do not think such a reasonable relationship necessarily follows from either the pleadings or the judicially-noticeable BOP policies that defendants have pointed to.

The parties are largely in agreement on the relevant framework. Notably, Tiedemann argues—and defendants do

not appear to dispute—that BOP's phone restrictions at least implicate Tiedemann's First and Fifth Amendment associational rights. *See Lee v. City of Los Angeles*, 250 F.3d 668, 685–86 (9th Cir. 2001) (recognizing a right to familial association grounded in both the First Amendment and the Fourteenth Amendment's due process clause). While some rights are so "fundamentally inconsistent with incarceration" that prisoners forfeit them entirely, *Gerber v. Hickman*, 291 F.3d 617, 620 (9th Cir. 2002), defendants do not argue that this is true of the associational rights here at issue.

This is for good reason. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution," and prisoners "retain[] those constitutional rights that are not inconsistent with [their] status as [] prisoner[s] or with the legitimate penological objectives of the corrections system." *Turner v. Safley*, 482 U.S. 78, 84, 95 (1987) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). And though "[s]ome curtailment of th[e] freedom [of association] must be expected in the prison context," the Supreme Court has never "impl[ied] that any right to intimate association is altogether terminated by incarceration . . . ." *Overton v. Bazetta*, 539 U.S. 126, 131 (2003). To the contrary, the Court has made clear that prisoners retain *some* associational right to communications with those outside prison, especially with family members. For instance, the Court has previously held "facially invalid" an "almost complete ban on [prisoners'] decision to marry," since the restriction was "not reasonably related to legitimate penological objectives." *Turner*, 482 U.S. at 99. In a case that was later overturned in part as to its reasoning but not its result, the Court likewise rejected broad content-based restrictions on prisoners' outgoing mail to non-prisoners. *Procunier v. Martinez*, 416 U.S. 396, 415–16 (1974),

*overruled in part by Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989)*. And while the Court has sustained significant abridgments of prisoners' associational rights, we note that sustained policies have often contained exceptions expressly privileging prisoners' communications with immediate family members. *See Overton*, 539 U.S. at 129–30, 133 (sustaining a prohibition on visitation by children, other than a prisoner's immediate family members).[5]

Of course, holding that prisoners retain associational rights in their communications with family members on the outside does not resolve the scope of those rights, nor the extent to which prison policies may legitimately infringe upon them. As to these questions, the parties largely agree on the relevant standard, which requires sustaining BOP's phone policies if they are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. This is a deliberately deferential standard, meant to ensure that "prison administrators and not the courts, are to make the difficult judgments concerning institutional operations." *Id.* (cleaned up). But as *Turner* itself made clear, it is also not a blank check, and instead requires some assessment of the actual relationship between the prison policy and the penological interests asserted. *Id.* at 94–99.

---

[5] We do not mean, in singling out communications with family members for special solicitude, to imply that communications between prisoners and non-family members are constitutionally unimportant. As noted above, the Court has previously rejected broad content-based restrictions on prisoners' outgoing mail, including to non-family recipients. *Martinez*, 416 U.S. at 415–16. And we note that in both recent and not-so-recent periods, some critically important political and literary works have consisted of correspondence from prisoners. *See, e.g.*, Martin Luther King Jr., *Letter from Birmingham Jail, in* Why We Can't Wait 76 (1964); Thomas Moore, The Tower Works (Yale ed. 1980).

Specifically, in assessing whether a prison policy is in fact reasonably related to legitimate penological interests, the Supreme Court has identified four relevant factors courts should consider: (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) the presence or "absence of ready alternatives." *Id.* at 89–90 (internal quotation marks omitted); *Overton*, 539 U.S. at 132.

Because application of each *Turner* factor requires what is ultimately a factual assessment, we have repeatedly emphasized that courts should not rush to conduct a *Turner* analysis "on a sparse factual record." *Shakur v. Schriro*, 514 F.3d 878, 893 (9th Cir. 2008). In *Shakur*, we reversed a district court's premature entry of summary judgment in favor of defendants with respect to a prisoner's Free Exercise and Equal Protection clause challenges to a prison's denial of a dietary accommodation. *Id.* at 885–88, 891–92. In particular, we held that absent "evidence in the record suggesting that [the prison] actually looked into providing kosher meat to all Muslim prisoners," and absent evidence as to whether Muslim prisoners other than the plaintiff would seek to also demand kosher meals if such meals were provided to the plaintiff, a court could not adequately determine how to evaluate the third *Turner* factor ("the impact the accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally"). *Id.* at 886–87 (cleaned up). Similarly, we held that "the district court failed to make adequate findings of

fact concerning the cost and availability of Halal meat," which prevented it from adequately analyzing the fourth *Turner* factor (the presence or "absence of ready alternatives"). *Id.* at 884, 887 (citations and internal quotation marks omitted). Likewise, in *Ward v. Walsh*, 1 F.3d 873 (9th Cir. 1993), we reasoned that a reviewing court could not evaluate the plausibility of a prisoner's claim for dietary accommodations until the district court made "specific factual findings and . . . engage[d] in a careful balancing of all the *Turner* factors." *Id.* at 879. *See also Dunn v. Castro*, 621 F.3d 1196, 1205 n.7 (9th Cir. 2010) (emphasizing that we have "previously declined to render a decision on whether a prisoner's rights have been violated under a challenged regulation in the absence of adequate factual findings by the district court on the *Turner* elements" and therefore "declin[ing] to render any decision on the application of *Turner* to the facts at issue in this case" at the pleading stage).

Here, too, we conclude that a full *Turner* analysis is not possible at the pleading stage. For instance, defendants argue that capping phone minutes at 300 per month and denying Tiedemann an exception bears a rational relationship to ensuring fairness of phone access among different prisoners and avoiding the perception by some prisoners that others are getting more phone time. But while fairness may require equalizing phone time among prisoners at some level, it is not obvious from the pleading stage that a 300-minute cap, as opposed to some higher cap, is needed, especially in light of Tiedemann's allegations that he was allowed unlimited time when he was housed at a privately run prison. Defendants point out that "not all jails are the same," such that what was appropriate at one private facility may not be appropriate across the board. *See Crime Just. & Am., Inc. v.*

*Honea*, 876 F.3d 966, 978 (9th Cir. 2017). But this point arguably cuts against defendants, since BOP's 300-minute cap applies systemwide. We do not of course hold that the 300-minute cap is unrelated to legitimate penological interests—just that we cannot resolve this *Turner* factor in defendants' favor at the pleading stage.

The problem is even more acute with respect to the remaining *Turner* factors. For instance, while the combination of 300 minutes of phone time plus visitation or letter writing may provide an adequate "alternative means of exercising" associational rights, there is essentially no evidence in the record as to the viability of these alternative means—either in general, or as regards Tiedemann and his children, whom Tiedemann alleges live sufficiently far away as to make visitation difficult and whose reading and writing skills are unknown. Similarly, there is no evidence in the record as to the impact of providing an exception to the monthly cap on other prisoners or on guards, although the fact that BOP's policies expressly provide for "good cause" exemptions at least suggests that any such impacts are in at least some cases manageable. Absent factual findings on these points, we do not see how we can conclusively resolve the *Turner* analysis in defendants' favor at the pleading stage. As such, we decline to affirm the district court's dismissal on the grounds that Tiedemann's complaint fails to allege a claim.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court in part and reverse in part. Specifically, we affirm the district court's dismissal of Tiedemann's damages claim under *Bivens* as well as his claim for injunctive relief as to his two former wardens. However, we reverse the

district court's dismissal of Tiedemann's claim for injunctive relief as to the Regional Director defendant and hold that Tiedemann has plausibly alleged a claim as to that defendant that survives the pleading stage. Finally, we hold that Tiedemann should be given leave to amend his complaint to add his current warden as a co-defendant.

**REVERSED IN PART AND AFFIRMED IN PART.**